# In the United States Court of Federal Claims

No. 17-1329
Filed: March 5, 2018[*]

*******************************************

|  |  |
|---|---|
| | * |
| | * |
| ERNST & YOUNG, LLP, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| PRICEWATERHOUSECOOPERS PUBLIC | * |
| SECTOR, LLP, | * |
| | * |
| Defendant-Intervenor. | * |
| | * |

5 U.S.C. § 706 (Administrative Procedure Act, Scope of Review); 28 U.S.C. § 1491(b)(1), (4) (United States Court of Federal Claims Bid Protest Jurisdiction); 48 C.F.R. §§ 1.102-2 (Performance Standards); 8.404 (Use of Federal Supply Schedules); 8.405-3 (Blanket Purchase Agreements (BPAs)); 9.504 (Contracting Officer Responsibilities); 9.505 (General Rules); 9.505-2 (Preparing Specifications or Work Statements); 9.506 (Procedures); 15.305 (Proposal Evaluation); 15.306 (Exchanges with Offerors After Receipt of Proposals); Rules of the United States Court of Federal Claims 52.1 (Motion for Judgment on the Administrative Record); 52.2 (Remand).

*******************************************

**Craig A. Holman**, Arnold & Porter Kaye Scholer LLP, Washington, D.C., Counsel for Plaintiff.

**Geoffrey M. Long**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Philip J. Davis**, Wiley Rein, LLP, Washington, D.C., Counsel for Defendant-Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD IN PART

---

[*] On February 23, 2018, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors that required correction. The parties had until March 2, 2018 at 3:00 p.m. E.S.T., to file any proposed redactions or revisions. The court has incorporated all appropriate redactions.

**BRADEN**, *Chief Judge*.

This bid protest concerns violations of several Federal Acquisition Regulations ("FAR"), including the failure of the Contracting Officer (the "CO") to "[i]dentify and evaluate" potential organizational conflicts of interest ("OCI"), "as early in the acquisition process as possible," and "[a]void, neutralize, or mitigate significant potential [OCIs] before contract award." *See* 48 C.F.R. § 9.504(a). That violation is more than sufficient grounds to support an injunction to set aside the contract award in this case, but coupled with other prejudicial FAR violations, requires a remand to the United States Department of Veterans Affairs (the "VA").

To facilitate review of this Memorandum Opinion And Final Order, the court has provided the following outline.

I.      RELEVANT FACTUAL BACKGROUND.

    A.      The United States Department Of Veterans Affairs's Market Area Health System Optimization Pilot Study.

    B.      The Solicitation For The Market Area Health System Optimization Project.

    C.      The Factors By Which Proposals Would Be Evaluated.

        1.      The Small Business Participation Commitment/Plan Factor.

        2.      The Non-Price Factors.

            a.      The Technical Factor.

            b.      The Corporate Experience Factor.

            c.      The Past Performance Factor.

            d.      The Veterans Involvement Factor

        3.      The Price Factor.

    D.      Five Proposals For The Market Area Health System Optimization Project Were Submitted.

    E.      The Source Selection Evaluation Board's Evaluation.

        1.      The Small Business Participation Commitment/Plan Factor.

        2.      The Non-Price Factors.

            a.      The Technical Factor.

            b.      The Corporate Experience Factor.

            c.      The Past Performance Factor.

            d.      The Veterans Involvement Factor.

        3.      The Price Factor.

        4.      Summary Of The Source Selection Evaluation Board's Evaluation.

F. The Contracting Officer's "Best Value Trade-Off" Determination And Award Of The Market Area Health System Optimization Contract To PricewaterhouseCoopers Public Sector, LLP.

II. PROCEDURAL HISTORY.

III. DISCUSSION.

 A. Subject Matter Jurisdiction.

 B. Standing.

 C. Whether The United States Department of Veterans Affairs's Award to PricewaterhouseCoopers Public Sector, LLP Was Contrary To Law, Not Rational, Or Arbitrary And Capricious.

  1. Standard Of Review For Judgment On The Administrative Record, Pursuant To RCFC 52.1.

  2. Standard Of Review For A Bid Protest.

  3. Ernst & Young, LLP's Amended Complaint.

  4. Ernst & Young, LLP's Motion For Judgment On The Administrative Record.

   a. The Source Selection Evaluation Board's Evaluation Failed To Comply With The Solicitation Or Otherwise Was Arbitrary And Capricious.

   b. PricewaterhouseCoopers Public Sector, LLP's Assumptions Did Not Comply With The Solicitation.

   c. The Contracting Officer Failed To Conduct Discussions.

   d. The Contracting Officer Failed Adequately To Mitigate Organizational Conflicts Of Interest.

   e. Injunctive Relief Is Appropriate.

  5. The Government's Response And Cross-Motion For Judgment On The Administrative Record.

   a. The Source Selection Evaluation Board's Evaluation Was Proper.

   b. PricewaterhouseCoopers Public Sector, LLP's Assumptions Complied With The Solicitation.

   c. The Contracting Officer Was Not Required To Conduct Discussions.

   d. Ernst & Young, LLP's Organizational Conflict Of Interest Claims Are Untimely And Unsupported.

6.      PricewaterhouseCoopers Public Sector, LLP's Response And Cross-Motion For Judgment On The Administrative Record.

7.      Ernst & Young, LLP's Reply In Support Of Motion For Judgment On The Administrative Record And Opposition To The Government's And PricewaterhouseCoopers Public Sector, LLP's Cross-Motions For Judgment On The Administrative Record.

      a.      The Extent To Which █████████████████ ████ Will Be Involved Is Uncertain.

      b.      Ernst & Young, LLP Did Not Waive Organizational Conflict Of Interest Claims.

      c.      Permanent Injunctive Relief Is Appropriate.

8.      The Government's Reply In Support Of Cross-Motion For Judgment On The Administrative Record.

9.      PricewaterhouseCoopers Public Sector, LLP's Reply In Support Of Cross-Motion For Judgment On The Administrative Record.

10.      The Court's Resolution.

      a.      Ernst & Young, LLP Did Not Waive Any Organizational Conflict Of Interest Claims.

      b.      The Contracting Officer Violated FAR 9.504(a), By Failing To Identify, Evaluate, And Mitigate A Significant Unequal Access To Information Organizational Conflict Of Interest Prior To Award Of The Market Area Health System Optimization Contract.

      c.      A Biased Ground Rules Organizational Conflict Of Interest, However, Did Not Exist.

      d.      The Source Selection Evaluation Board Violated FAR 8.405-3(b)(2), By Failing To Evaluate Proposals, Pursuant To The Requirements Of The Solicitation.

            i.      As To Ernst & Young, LLP's Technical Proposal.

            ii.      As To PricewaterhouseCoopers Public Sector, LLP's Past Performance Examples.

      e.      The Contracting Officer Violated FAR 1.102-2(c)(3), By Failing To Conduct Discussions Prior To Award Of The Market Area Health System Optimization Contract.

      f.      The Administrative Record Does Not Evidence That The Contracting Officer's Decision Not To Award The Market Area

Health System Optimization Contract To Ernst & Young, LLP Was Arbitrary And Capricious, Or Lacked A Rational Basis.

g.   Ernst & Young, LLP Was Prejudiced By The Contracting Officer's And The Source Selection Evaluation Board's FAR Violations.

h.   Ernst & Young, LLP Is Entitled To Injunctive Relief.

IV.   CONCLUSION.

## I.     RELEVANT FACTUAL BACKGROUND.[1]

### A.     The United States Department Of Veterans Affairs's Market Area Health System Optimization Pilot Study.

On December 6, 2016, the VA awarded The Craddock Group, LLC ("Craddock") Contract No. VA101F-17-C-2843 (the "Pilot Study Contract"). Tab 27, AR 930–39. This contract required Craddock to conduct a pilot study (the "Pilot Study") in contemplation of "a National Realignment Plan," known as the Market Area Health System Optimization Project (the "MAHSO Project"). Tab 1, AR 4; Tab 4, AR 83; Tab 27, AR 830, 930–39. The MAHSO Project sought to "develop a National Realignment Strategy . . . to establish high performing health care networks for [Veterans Health Administration (the "VHA")] services and facilities." Tab 1, AR 4.

Under the Pilot Study Contract, Craddock was required to "[d]efine the ideal healthcare delivery system design processes and outputs." Tab 27, AR 934. In doing so, Craddock was "to evaluate feasibility, time, costs, adverse events, strengths and weakness of the proposed [MAHSO Project] to improve upon the study design." Tab 1, AR 5. Craddock was required to assess three VHA market areas (the "Pilot Study Market Areas") to "develop[] a strategy to provide exceptional healthcare that improves the health and wellbeing of [v]eterans throughout the country." Tab 27, AR 830; *see also* Tab 27, AR 934. This "strategy," referred to as the "Methodology," was "to be used as a guide for future consulting firms to follow . . . during the . . . national 'roll out'" of the MAHSO Project across 96 VHA market areas. Tab 27, AR 830–31; Tab 27, AR 934. Between April 2017 and August 2017, Craddock together with a subcontractor, PricewaterhouseCoopers Public Sector, LLP ("PwC"), developed the Methodology. Tab 2, AR 26; Tab 27, AR 831. To produce the Methodology, the VA provided Craddock and PwC with "proprietary" non-public "[g]overnment-issued data" (the "Pilot Study Data") for the three Pilot Study Market Areas. Tab 27, AR 831; Tab 27, AR 835–36 ("Data was directly provided to . . . Craddock . . . by the [VA] during the development of the [M]ethodology[.]").

The Methodology was a "straightforward step-by-step process that outline[d] the high level approach, activities, and data that [would] be used" during the MAHSO Project. Tab 27, AR 835; *see also* Tab 9, AR 377 ("The roadmap below outlines the high level approach, activities, and data that were used for each market assessment."). The Methodology described a "general approach for analyzing each [VHA] market [area]" (Tab 27, AR 833), by the performance of eight defined tasks: (1) "Evaluate Market Geography and Demographics;" (2) "Conduct Site Visits and Interviews;" (3) "Estimate Current and Future Market Demand;" (4) "Estimate Current and Future Total Market Supply;" (5) "Assess Quality, Satisfaction, Accessibility, Cost, Facility Condition and Impact on Mission;" (6) "Review Preliminary Analysis, Results and Conclusions with Local Market and VISN[2] Staff;" (7) "Recommend Market Optimization Plan Based on Enterprise-wide

---

[1] The facts recited herein were derived from the Second Corrected Administrative Record (Tab 1, AR 1–Tab 27, AR 981). ECF No. 39.

[2] The VHA is divided into 18 regional Veterans Integrated Service Networks ("VISN"). *See Locations: Veterans Health Admin.*, U.S. DEP'T OF VETERANS AFFAIRS, https://www.va.gov/directory/guide/division.asp?dnum=1 (last visited Feb. 22, 2018).

Guiding Principles and Performance Against Quality, Access, Cost, Satisfaction and Mission Standards;" and (8) "Integrate Market Optimization Recommendations into VISN and National Strategic Plans." Tab 9, AR 377.

During the time Craddock and PwC were working on the Methodology, the VA separately "began developing a procurement package" (the "MAHSO Solicitation" or "Solicitation") with the assistance of the CO "to acquire consulting services" to perform the MAHSO Project, "based on . . . experience[] gained . . . through participating in the [P]ilot . . . [S]tud[y] and assisting in the evolution of the [M]ethodology." Tab 27, AR 830, 837. The VA completed the MAHSO Solicitation before the Methodology was finalized (Tab 27, AR 832 ("[T]he methodology was not complete at the time of solicitation issuance[.]")), but the VA was aware of the content and status of the Methodology, as the VA "worked closely" with Craddock and PwC to develop the Methodology. Tab 27, AR 831; Tab 27, AR 835 ("Craddock . . . and PwC had direct information concerning the [M]ethodology since they were currently in the process of developing it with the [VA].").

On or about May 17, 2017, the CO was informed that Craddock and PwC would "likely bid" on the MAHSO Project. Tab 27, AR 831.

**B.      The Solicitation For The Market Area Health System Optimization Project.**

On June 30, 2017, the VA issued the MAHSO Solicitation, Solicitation No. VA101-17-Q-0395. Tab 7, AR 139. The Solicitation was amended on July 7, 2017 ("Amendment A00001") and again on July 20, 2017 ("Amendment A00002"). Tab 8, AR 227; Tab 9, AR 337; Tab 27, AR 896. On July 7, 2017, The VA sent the Solicitation directly to Deloitte Consulting LLP ("Deloitte"), Ernst & Young, LLP ("E&Y"), KPMG LLP ("KPMG"), and PwC, and also posted the Solicitation on the General Services Administration's (the "GSA") eBuy website. Tab 18, AR 678.

The VA requested proposals from contractors "with deep and broad healthcare system planning expertise" (Tab 9, AR 346), to "execut[e] extensive market studies of 96 . . . [VHA] markets . . . and coalesce all findings into an integrated synergistic national realignment study." Tab 1, AR 4. The Solicitation stated that the VA "intend[ed] to establish a [single-award blanket purchase agreement ("BPA")]" under which the VA would place "calls," or task orders, as "the need for services ar[ose]." Tab 7, AR 139, 141. The Solicitation called for an initial task order ("Task Order One") to be completed within four months, *i.e.*, "120 calendar days." Tab 9, AR 339–44. The VA expected to award Task Order One "at [the] time of establishing the BPA." Tab 8, AR 270.

The Solicitation included two Statements of Work ("SOW"): a BPA SOW (Tab 9, AR 346–74); and a Task Order One SOW. Tab 9, AR 339–44. The BPA SOW identified three "Task Areas." Tab 9, AR 349–54. "Task Area 1" was described as

[u]sing [the] . . . [M]ethodology defined through [the] [P]ilot [Study] . . . , develop a National Enterprise Strategy to Create High Performing Networks and Optimize Health Care Service Delivery by defining an optimum Health Care Service Delivery System Design for each of the identified markets across the [VHA] (now

identified as 93 plus three previously completed pilot markets, for a total of 96) that will continue to improve access, satisfaction, and deliver efficient, high quality care in a [v]eteran-centric way.

Tab 9, AR 349.

"Task Area 2" was described as

[u]sing [the] . . . [M]ethodology consisting of proven analytical tools and applications to assess access, quality, and cost of available community care, conduct market assessments for all V[H]A markets across the nation. Evaluate VA care in each market and identify opportunities for [the] VA to purchase care from community providers. Aggregate and analyze assessment results to inform the Enterprise-wide National Realignment Strategy. Provide clear, data driven, comprehensive written reports/presentations of findings, options and recommendations for each market.

Tab 9, AR 351.

"Task Area 3" was described as

additional studies and analyses [to] further enable [the] VA to optimize its High Performing Network Design and National Realignment Strategy and elicit appropriate executive support, strategic communication, and stakeholder management.

Tab 9, AR 352.

The Task Order One SOW, included components of all three Task Areas described in the BPA SOW, and required the successful offeror to develop Phase I of the National Realignment Strategy in approximately 32 VHA market areas across six VISNs and "recommend potential health care service delivery realignments as well as recommendations to continue care as currently provided in each market [area] for a 10 year period." Tab 9, AR 339. The Task Order One SOW required the successful offeror to "have one team per VISN" (Tab 9, AR 339) and, as a "General Requirement," the VA advised prospective offerors that "[t]ravel [would be] required for at least six teams of five healthcare planners and data analysts to assess . . . [VHA market areas] within each of the six (6) VISNs[.]" Tab 9, AR 344. In addition, the Task Order One SOW provided that "[t]eams shall be supported by . . . disciplines and specialists[,] as needed. Core team leads include a Senior Medical Facility Planner (Architect) and a Senior Medical Services Planner (Healthcare Planner)." Tab 9, AR 344.

The Task Order One SOW required "consistent application" of the Methodology "across all assessment teams." Tab 9, AR 339 ("The [c]ontractor will be responsible for ensuring consistent application of the [M]ethodology across all assessment teams. The market area health system plans will be conducted according to [the M]ethodology."); *see also* Tab 9, AR 341–42. But, none of the prospective offerors, except PwC had access to the Methodology when the Solicitation was issued on June 30, 2017. Tab 9, AR 337. Several prospective offerors, however, requested that the Methodology be provided to all the prospective offerors. Tab 8, AR 298; *see*

*also* Tab 8, AR 299–300, 302.  The CO refused, but promised that the Methodology would "be provided after award of the BPA."  Tab 8, AR 298.  The offerors also requested access to "any assumptions used in development" of the Methodology.  Tab 8, AR 298; *see also* Tab 8, AR 299–300, 302.  The CO responded that the "[M]ethodology is still being developed . . . but will be relatively straight forward in nature, and after completion will require extensive input/customization from the selected contractor."  Tab 8, AR 299.  In addition, prospective offerors requested "information on who developed the [M]ethodology."  Tab 8, AR 298.  The CO responded that Craddock was "assisting" in development of the Methodology, but did not mention PwC's involvement.  Tab 8, AR 298–300, 302.

After the CO's initial responses, but prior to release of the Methodology, a prospective offeror expressed concern that

> the [VA] recognizes that the [M]ethodology, which is key to the technical approach, is currently being developed by contractors as part of the [P]ilot[ Study].  Given that knowledge of th[e M]ethodology *constitutes both unequal access to information and creates biased ground rules that would subsequently provide an unfair advantage to the current pilot support contractor and their team*; and given the increased likelihood that participation in development of the [M]ethodology could subsequently impair a contractor's ability to provide objective advice in evaluating market options and developing the subsequent National Enterprise Strategy, can the [VA] confirm that these companies will not be allowed to bid on th[e MAHSO Project]?

Tab 9, AR 345 (emphasis added).  The CO responded that "there [would] be no such prohibitions."  Tab 9, AR 345.

A draft of the Methodology was eventually provided to prospective offerors with Amendment A00002 on July 20, 2017, only seven days before proposals were due on July 27, 2017.  Tab 9, AR 337.  The underlying Pilot Study Data provided to Craddock and PwC by the VA, however, was never provided to the other prospective offerors.  Tab 27, AR 833.

### C.     The Factors By Which Proposals Would Be Evaluated.

The Solicitation advised prospective offerors that the VA would "use the best value trade-off process to select . . . the most beneficial quote, price and other factors considered."  Tab 8, AR 269.  Therefore, the award would be made

> based on the best overall (i.e., best value) quote that meets or exceeds the minimum small business participation percentages established by the [VA] under a *Small Business Participation Commitment/Plan Factor*, and is determined to be most beneficial to the [VA], with appropriate consideration given to the [P]rice [F]actor and the following *four additional non-price evaluation factors: Technical* (including Technical Approach, Staffing/Management Plan, and Key Personnel Résumés), *Corporate Experience*, *Past Performance*, and *Veterans Involvement*.

Tab 8, AR 269 (emphasis added).

The VA committed to "award a contract resulting from th[e MAHSO S]olicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the [VA], price and other factors considered." Tab 8, AR 268. The Solicitation, however, also advised offerors that

> [t]he [VA] intends to establish a BPA and award [Task ]Order [One] without further communicating with [c]ontractors. . . . *However, the [VA] reserves the right to communicate with any or all [c]ontractors submitting a quote, if it is determined advantageous to the [VA] to do so*. . . . A [c]ontractor may be eliminated from consideration without further communication if its non-price and/or pricing quotes are not among those [c]ontractors considered most advantageous to the [VA] based on a best value determination.

Tab 8, AR 269 (emphasis added).

### 1.     The Small Business Participation Commitment/Plan Factor.

The Solicitation stated that the "Small Business Participation Commitment/Plan Factor [was] an acceptable/unacceptable (go/no go) factor, and as such, failure to meet the small business participation requirements established in the [S]olicitation will render a [q]uoter's response unacceptable and therefore not eligible for award, with no further award consideration given." Tab 8, AR 269. Under the Small Business Participation Commitment/Plan Factor, the Solicitation required: (1) that "[a]t least 30% of the total dollar value of [Task Order One go] to small business(es)[;]" and (2) that "[a]t least 10% of the total dollar value of [Task Order One go] to a . . . Service Disabled Veteran Owned Small Business ("SDVOSB") or at least 12% of the total dollar value of [Task Order One go] to a . . . Veteran Owned Small Business ("VOSB")." Tab 8, AR 271.

### 2.     The Non-Price Factors.

The Solicitation provided that

> [a]fter being determined acceptable for the Small Business Participation Commitment/Plan, the quote will be evaluated utilizing the four remaining non-price factors[.]  To receive consideration for award, a rating of no less than "Satisfactory" must be achieved for the Technical and Corporate Experience Factors.  Contractors are cautioned that the award may not necessarily be made to the [c]ontractor quoting the lowest price, or to the [c]ontractor with the most highly rated technical quote.  *Award may be made to other than the lowest priced quote, if the [VA] determines that a price premium is warranted due to the merits of one or more of the non-price factors*.  Additionally, *the [VA] will not establish a BPA with any [c]ontractor whose price cannot be found fair and reasonable*.

Tab 8, AR 270 (emphasis added).

As to the "Relative Importance" of the Non-Price Factors, the Solicitation provided that "[t]he Technical Factor and Corporate Experience [F]actors are equally important.  Together, these two factors are significantly more important than the Past Performance Factor[,] which is

significantly more important than the Veterans Involvement Factor.  All [N]on-Price Factors, when combined, are significantly more important than Price."  Tab 8, AR 269.

The following court exhibit depicts the relationship between each of the evaluation factors and their relative importance.



**Notes:**
- The Small Business Participation Commitment/Plan Factor was a threshold "acceptable/unacceptable (go/no go) factor."  Tab 8, AR 269.
- The Technical and the Corporate Experience Factors were "equally important," but "[t]ogether . . . significantly more important than the Past Performance Factor."  Tab 8, AR 269.
- The Past Performance Factor was "significantly more important than the Veterans Involvement Factor."  Tab 8, AR 269.
- Together, all Non-Price Factors were "significantly more important than Price."

### a.      The Technical Factor.

Regarding the Technical Factor, the Solicitation stated that each offeror was required to "provide a Technical Volume that include[d]": (1) "a description of the [offeror's] BPA-level technical approach to providing VHA Health System Optimization . . . demonstrat[ing] its understanding of the work, including understanding the objectives of the [BPA SOW] . . . and specific tasks, challenges, and risks[;]" (2) "[a] staffing/management plan tailored to [Task Order One] covering the first year of performance;" and (3) "[r]ésumés for the key personnel meeting the requirements in the . . . SOW[.]"  Tab 8, AR 282.

11

The VA was to evaluate each offeror's Technical Volume by considering four elements. Tab 8, AR 272–73. First, the VA would evaluate the offeror's understanding of the problem, by considering "the extent to which [the offeror] demonstrate[d] a clear understanding of all features involved in solving the problems and meeting and/or exceeding the requirements presented in the [S]olicitation." Tab 8, AR 272. Second, the VA would evaluate the feasibility of each offeror's approach, by considering "the extent to which the [offeror's] proposed approach is workable and the end results achievable[,]" including consideration of the "level of effort and mix of labor proposed to perform the tasks identified in [Task Order One]." Tab 8, AR 272. Third, the VA would evaluate the offeror's key personnel, by considering "whether the quoter's proposed key personnel [were] available to begin on [Task Order One] . . . and ha[d] the minimum required knowledge, skills, and experience to perform the tasks under th[e Solicitation.]" Tab 8, AR 272. Fourth, the VA would evaluate each offeror's "Staffing/Management Plan[,]" to "determine whether the quoter ha[d] adequate key personnel readily available to perform the required services within the requested period of time." Tab 8, AR 273.

After evaluation, each offeror would be assigned one of five possible ratings: "Excellent;" "Good;" "Satisfactory;" "Marginal;" or "Unacceptable." Tab 18, AR 689. Offerors receiving a rating of less than "Satisfactory"[3] would not be eligible for an award. Tab 8, AR 270.

### b. The Corporate Experience Factor.

Regarding the Corporate Experience Factor, the Solicitation stated that each offeror was required to "provide up to three specific examples of its past corporate experience" and "[d]escribe how its past experience in commercial and [g]overnment healthcare ha[d] equipped it with the knowledge, skills and abilities to beneficially impact a healthcare delivery system for a large, complex enterprise-wide health care network." Tab 8, AR 283.

In evaluating each offeror's corporate experience, the VA was to "determine the extent to which a quoter's corporate experience ha[d] equipped it with the knowledge, skills and ability to support transformation and implementation of a health care delivery system for a large, complex regional (preferably national) health care network." Tab 8, AR 273. The evaluation would include a "confidence assessment of the quoter's corporate experience . . . reflect[ing] the [VA's] confidence in and the likelihood that the quoter [would] successfully complete the [S]olicitation requirements based on previous demonstrated recent and/or relevant experience." Tab 8, AR 273. The Solicitation provided that "[i]n this context, 'quoter' refers to the prime [c]ontractor and all proposed major subcontractor(s)."[4] Tab 8, AR 273. The Solicitation provided further that "only

---

[3] The VA defined "Satisfactory" as: "[a]dequate understanding; meets the minimum requirements of the [Solicitation]." Tab 18, AR 689.

[4] In response to a prospective offeror's request regarding "the requirements to determine what subcontractor is considered a major subcontractor," the CO indicated that "[a] major sub-contractor would be defined as any sub-contractor that is performing a critical component of the work identified. *It is up to the quoter to identify their major subcontractors*." Tab 8, AR 303 (emphasis added).

corporate experience is evaluated and that personnel experience will not be evaluated as part of this factor." Tab 8, AR 273 (emphasis omitted).

After evaluation, each offeror would be assigned one of four possible ratings: "Substantial Confidence;" "Satisfactory Confidence;" "Limited Confidence;" or "No Confidence." Tab 18, AR 689. Offerors receiving a rating of less than "Satisfactory Confidence"[5] would not be eligible for an award. Tab 8, AR 270.

### c.    The Past Performance Factor.

Regarding the Past Performance Factor, the Solicitation stated that each offeror was allowed to submit "a narrative detailing up to three (3) contracts (prime contracts, task/delivery orders, and/or major subcontracts) in performance during the past three (3) years from the date of issuance of the . . . [S]olicitation, which are relevant to the efforts required by the [Solicitation]." Tab 8, AR 284. The Solicitation provided that "[a]reas of relevance include all objectives addressed in the [BPA] SOW." Tab 8, AR 284. Although offerors were allowed to include past efforts of their major subcontractors, the Solicitation stated that "[d]ata concerning the prime quoter shall be provided first, followed by each proposed major subcontractor, if applicable, in alphabetical order." Tab 8, AR 284.

In evaluating each offeror's past performance, the VA was to "assess the relative risks associated with a quoter's likelihood of success in fulfilling the [S]olicitation's requirements as indicated by that quoter's record of past performance." Tab 8, AR 274. Again, the Solicitation indicated that "[i]n this context, 'quoter' refers to the prime [c]ontractor and all proposed major subcontractor(s)." Tab 8, AR 274. The Solicitation clarified, however, that "in this assessment, the [VA] will consider past performance for the proposed prime [c]ontractor (identified in Block 17a of the SF 1449) to be significantly more important than past performance examples submitted for any other member of the vendor's proposed structure." Tab 8, AR 274. The VA would assess each offeror's "relative risk" "based on the quality, relevancy (size, scope, and complexity) and recency (within last 3 years) of the quoter's past performance, as well as that of its major subcontractor(s), as it relates to the probability of successful accomplishment of the required effort." Tab 8, AR 274.

After evaluation, each offeror would be assigned one of four possible ratings: "Neutral/Unknown;" "Low Risk;" "Moderate Risk;" or "High Risk." Tab 18, AR 690.

### d.    The Veterans Involvement Factor

Regarding the Veterans Involvement Factor, the Solicitation required the VA to

assign full evaluation credit for a quoter (prime [c]ontractor) which is a . . . registered and verified SDVOSB and partial credit for a verified VOSB prime [c]ontractor. Non-SDVOSB/VOSB quoters proposing to subcontract 10% or more

---

[5] The VA defined "Satisfactory Confidence" as: "[b]ased on the quoter's recent/relevant record of experience, the [VA] has a reasonable expectation that the quoter will successfully perform the required effort." Tab 18, AR 689.

of [Task Order One's] value to a verified SDVOSB concern or 12% or more of [Task Order One's] value to a verified VOSB concern [would] receive some evaluation credit.

Tab 8, AR 275.

### 3.     The Price Factor.

Regarding the Price Factor, each offeror was required to "complete and submit [a] Price Volume," including: (1) "[t]he BPA Rate Schedule . . . of the [Solicitation], quoting labor rates for the required labor categories;" and (2) "[t]he Call Labor Basis worksheet . . . of the [Solicitation], showing the labor categories, hours, and labor rates used to develop the quoted fixed-price." Tab 8, AR 287.  The Solicitation also provided that "[p]rice [was to] be evaluated for reasonableness by assessing[:] (1) the reasonableness of the quoted labor rates, as well as (2) the reasonableness of the total quoted price for [Task Order One], considering the level of effort and the mix of labor proposed to perform the specific tasks being ordered." Tab 8, AR 276.  In addition, the Solicitation provided that

> [t]he [VA] anticipates that the effort and resources required for [Task Order One] will be representative of future [task orders].  Accordingly, pricing for [Task Order One] serves to provide the [VA] with a reasonable and realistic estimate for how each subsequent [task order] will be priced by a respective quoter.  The CO is therefore responsible for determining that the price for [Task Order One] is reasonable from all responses received in accordance with the evaluation criteria.  In making this determination, the [VA] will consider the level of effort and the mix of labor proposed to perform the specific tasks being ordered.

> The proposed BPA pricing, consisting of [Task Order One] pricing and the option years' labor rates will be used in the "best value" analysis and determination made by the [CO].

Tab 8, AR 276.

After evaluation, "[p]rice [would] not be assigned an adjectival rating, but [would only be] evaluated to determine whether it [was] 'fair and reasonable.'" Tab 18, AR 691.  "[T]he [VA would] not establish a BPA with any [c]ontractor whose price [could not] be found fair and reasonable." Tab 8, AR 270.

The VA estimated that Task Order One would require 81,920 hours of labor, covering eight labor categories.  Tab 18, AR 727.  Using "labor rates from approximately four GSA contract holders with similar labor categories," the VA estimated a "[t]otal estimate" for Task Order One of $██████, including "the not to exceed travel amount of $600,000." Tab 18, AR 727.  To evaluate the reasonableness of each offeror's proposed price, however, an estimate of $██████ was used, reflecting ████████. Tab 18, 728–29, 731–33.  The VA also prepared an Independent Government Cost Estimate (the "IGCE") for the MAHSO Project "through market research, recent contracts for pilot analysis studies of VHA markets and average GSA labor rates from a sample of potential contractors." Tab 1, AR 6.  The IGCE was $████. Tab 1, AR 6.

**D.      Five Proposals For The Market Area Health System Optimization Project Were Submitted.**

Proposals initially were due on July 21, 2017; the VA, however, extended that date to July 27, 2017 by Amendment A00001.  Tab 27, AR 896; *see also* Tab 9, AR 385.  Prior to the final deadline, five offerors submitted proposals, including: Deloitte, E&Y, Huron Consulting Group Inc. ("Huron"), McKinsey & Company, Inc. ("McKinsey"), and PwC.  Tab 18, AR 678. The Source Selection Evaluation Board (the "SSEB") determined that all five offerors "were . . . responsive and included [them] in the competition."  Tab 18, AR 678.

**E.      The Source Selection Evaluation Board's Evaluation.**

**1.      The Small Business Participation Commitment/Plan Factor.**

Regarding the Small Business Participation Commitment/Plan Factor, each offeror received an "Acceptable/Go" rating.  Tab 18, AR 692–97.

**2.      The Non-Price Factors.**

**a.      The Technical Factor.**

Regarding the Technical Factor, only PwC received a "Good"[6] rating; Deloitte, E&Y, Huron, and McKinsey each received a less than "Satisfactory" rating of "Marginal."[7] Tab 18, AR 698–709.  Consequently, only PwC was eligible for an award.  Tab 8, AR 270.

In justifying E&Y's rating of "Marginal," the SSEB stated:

E[&]Y's staffing levels and labor mix[8] shown for the proposed plan showed a vague understanding of the complexity and size of the task at hand. ████████████████

---

[6] The VA defined "Good" as: "[t]horough understanding."  Tab 18, AR 689.

[7] The VA defined "Marginal" as: "[s]uperficial or vague understanding; could not award without further communications."  Tab 18, AR 689.

[8] E&Y proposed "██ [VISN] teams each composed of ████████████████
████████████████████[.]" Tab 10, AR 404.  E&Y explained that



[e]ach [VISN] team [would] have ████████████████████████
████████████████████████████
██████. Each [VISN] team will also have ████████████████
████████████████████ █
████████████████████████████
████████████████████████████
Each site team will also use ████████████████████

---

██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████ ████████ ██████████████████████
███████ █ ██████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████

Tab 18, AR 700.

The SSEB expressed concern about the proposed staffing level for E&Y's VISN teams, because ██████████████████████████████. Tab 10, AR 404; Tab 18, AR 701; *see also* Tab 18, AR 702 ("█████████████████████████████████████████████ ██████████").[9]  The SSEB also noted a "weakness" in "staffing" for Deloitte, Huron, and McKinsey, ████████████████████████████████████. Tab 18, AR 699, 704, 706, 737.

In contrast, PwC proposed ██ members for each of the ██ VISN teams. Tab 11, AR 519. As to PwC's Technical Factor rating of "Good," the SSEB stated:

> P[w]C's technical write up and staffing levels/labor mix[10] shown for the proposed plan demonstrated a thorough understanding of the complexity and size of the task at hand.  Their overall focus/approach and plan show that PWC can accomplish the BPA tasks requirement above minimal standards.  Explanation of staffing levels ██████████████████████████████████████████████.

Tab 18, AR 707.

Regarding PwC's proposed "staffing" and "labor mix" the SSEB concluded that "P[w]C has presented/prepared a team that ████████████████████████.  P[w]C presented a good overall management plan that showed a good labor mix.  There was some concern[, however,] . . . that ████████████████████." Tab 18, AR 709.

---

████████████████████████████████████████████
██████████████████████

Tab 10, AR 420.

[9] In the evaluation of E&Y's technical proposal, the SSEB mistakenly referred to E&Y as "Deloitte," stating that  E&Y's "[q]uote did not provide enough detail to show that *Deloitte* understood the VA[']s efforts or the data to be made available." Tab 18, AR 701 (emphasis added).

[10] PwC proposed ██ VISN teams composed of ████████████████████████ ████████████████████████████████████████████ Tab 11, AR 519.

### b.    The Corporate Experience Factor.

Regarding the Corporate Experience Factor, only PwC received a "Substantial Confidence"[11] rating; the other offerors received a less than "Satisfactory Confidence" rating of "Limited Confidence."[12]  Tab 18, AR 710–15.  As a result, only PwC was eligible for an award. Tab 8, AR 270.

PwC submitted three corporate experience examples: ███████████████████████ ████████    Tab 11, AR 553–59.  The SSEB noted that "[o]verall P[w]C ha[d] the corporate experience needed for a project of this magnitude and ████████████████████████ ████████████████████████."  Tab 8, AR 714.  In contrast, regarding E&Y's Corporate Experience rating of "Limited Confidence," the SSEB observed that "[o]verall E[&]Y presented a lack of needed experience, ████████  █████████  ████████ ████████████████████████████████."  Tab 18, AR 711.

### c.    The Past Performance Factor.

Regarding the Past Performance Factor, only PwC received a "Low Risk"[13] rating; Deloitte, E&Y, Huron, and McKinsey each received a "Moderate Risk"[14] rating.  Tab 18, AR 716–22.

With regard to E&Y's past performance, the SSEB determined that "[a]ll of [E&Y's] example[s] . . . ████████████████████████████████████████."  Tab 18, AR 717.  In contrast, the SSEB was impressed that PwC "[d]emonstrated past performance to meet[] the needs of the BPA and ████████████████████████."  Tab 18, AR 721. PwC submitted three past performance examples: "████████████████████████████ ████████████████████████████████████; "███████████████████████████████████ ████████████████████████; and "████████████████████████████████████████ ████████████████████████████.  Tab 11, AR 564–66.  Each of these projects, however, was performed by ████████████████████████ ("████████████"), not PwC.  Tab 11, AR 564–66 (each project was performed by the contractor associated with CAGE Code ██████  and DUNS Number ██████████); *see also* SAM Search

[11] The VA defined "Substantial Confidence" as: "[b]ased on the quoter's recent/relevant record of experience, the [VA] has a high expectation that the quoter will successfully perform the required effort."  Tab 18, AR 689.

[12] The VA defined "Limited Confidence" as: "[b]ased on the quoter's recent/relevant record of experience, the [VA] has a low expectation that the quoter will successfully perform the required effort."  Tab 18, AR 689.

[13] The VA defined "Low Risk" as: "[l]ittle doubt exists, based on the quoter's performance record, that the quoter can perform the proposed effort."  Tab 18, AR 690.

[14] The VA defined "Moderate Risk" as: "[s]ome doubt exists, based on the quoter's performance record, that the quoter can perform the proposed effort."  Tab 18, AR 690.



Results, ███████████  ████████  ████████  ██, Sʏs. ғᴏʀ Aᴡᴀʀᴅ Mɢᴍᴛ., https://www.sam.gov/portal/SAM/#1 (follow the "SEARCH RECORDS" hyperlink; then perform a "CAGE Code Search" for "█████" or a "DUNS Number Search" for "██████████") (showing that ███████████ is associated with CAGE Code █████ and DUNS Number ███████). PwC, however, did not list ██████████ as a "major subcontractor." Tab 11, AR 571.  PwC's proposal indicated, however, that

> PwC will . . . draw on the staff and expertise of its teaming partners and the experience, resources, and capabilities of its affiliate, . . . ████████████[.]  Both PwC and ███  . . . are partners in their common parent PricewaterhouseCoopers LLP ("PwC US") and report ultimately to PwC US management.  ████████████ resources will be directly and meaningfully involved in this effort.

Tab 11, AR 519.

### d.     The Veterans Involvement Factor.

Regarding the Veterans Involvement Factor, each offeror received a rating of "Some Consideration."  Tab 18, AR 723–26.

### 3.     The Price Factor.

Regarding PwC's proposed price of $11,981,646.00 for Task Order One (Tab 11, AR 580.4), the SSEB concluded that

> [t]he overall level of effort basis was evaluated and determined to be acceptable for accomplishing the tasks identified.  The [VA] estimate lists approximately ████ [l]abor hours needed to complete [Task Order One's] associated tasks and PwC proposed for █████ labor hours putting them ████████████ of the estimated hours needed to complete the tasks.  PwC presented a good mix of labor categories to develop their teams and properly estimated the appropriate level of staffing/effort needed to complete this large and complex task.

> Given that PwC's level of effort to perform the [MAHSO Project] has been determined . . . acceptable, the total price of $11,981,646.00 is fair and reasonable.  PwC['s] proposed costs are ███████ than the [VA's IGCE].  The difference between PWC's fixed price after discounts of ████ and the IGCE is driven by the fact that the IGCE applies ██████████ discount assumed for all vendors.

Tab 18, AR 734.

Accordingly, the SSEB determined that PwC's price was "Fair and Reasonable."  Tab 18, AR 733–35.

In contrast, as to E&Y's proposed price of $███████ for Task Order One (Tab 10, AR 467.7), the SSEB concluded that

> [t]he overall level of effort basis was evaluated and determined [by the SSEB] to not be acceptable for accomplishing the tasks identified. The [VA] assumed ██████ ████ level of effort to be involved to ensure a ██████████████████████████████████. The [VA] estimate list[s] approximately █████ [l]abor hours needed to complete [Task Order One's] associated tasks and E[&]Y████ proposed . . . █████ labor hours. Although E[&]Y presented ████████████████████████████████████████████████████████████ ██████████████.

> Given that E[&]Y's level of effort to perform the [MAHSO Project] has been determined not acceptable, the total price of $████████████ is not fair and reasonable. The difference between E[&]Y's fixed price and the IGCE ████████ ████████████████████████████.

Tab 18, AR 730.

For Task Order One, Deloitte's proposed price was $████████, Huron's proposed price was $█████████, and McKinsey's proposed price was $████████. Tab 18, AR 736. The SSEB, however, found similar "staffing" and "level of effort" problems in each of their proposals. Tab 18, AR 699, 704, 706; *see also* Tab 18, AR 736 ("Although, Individual labor rates were ████████ and determined fair and reasonable by [the] GSA and the SSEB, the labor mix[/]level of effort were ████████████████ by [Deloitte, E&Y, Huron, and McKinsey]. Since [Task Order One] was indicative of future [task] orders, and all four quoters provided staffing in their level of effort that would █████████████████████████, there was ████████████████ ████████████████████████████"). Therefore, the SSEB concluded that it could not determine whether the prices proposed by Deloitte, E&Y, Huron, and McKinsey were "Fair and Reasonable." Tab 18, AR 727–33, 735. As a result, these offerors were not eligible for an award. Tab 8, AR 270.

4.     **Summary Of The Source Selection Evaluation Board's Evaluation.**

The SSEB's "findings from evaluations" are summarized in the following table:

| Factor | PwC | Deloitte | McKinsey | EY | Huron |
|---|---|---|---|---|---|
| SBPV | Acceptable/Go | Acceptable/Go | Acceptable/Go | Acceptable/Go | Acceptable/Go |
| Technical Approach | Good | Marginal | Marginal | Marginal | Marginal |
| Corporate Experience | Substantial Confidence | Limited Confidence | Limited Confidence | Limited Confidence | Limited Confidence |
| Past Performance | Low Risk | Moderate Risk | Moderate Risk | Moderate Risk | Moderate Risk |
| Veteran Involvement | SOME CONSIDERATION | SOME CONSIDERATION | SOME CONSIDERATION | SOME CONSIDERATION | SOME CONSIDERATION |
| Price (both BPA rates and Call Price) | $11,981,646.00 Fair and Reasonable | Cannot Determine Fair and Reasonable | Cannot Determine Fair and Reasonable | Cannot Determine Fair and Reasonable | Cannot Determine Fair and Reasonable |

Tab 18, AR 736.

F.     **The Contracting Officer's "Best Value Trade-Off" Determination And Award Of The Market Area Health System Optimization Contract To PricewaterhouseCoopers Public Sector, LLP.**

On August 30, 2017, the CO issued a "Best Value Determination and Award Decision" (Tab 18, AR 675), wherein the CO "concur[red] with the [SSEB's] evaluations" and summarized the "best value trade-off" determination, as follows:

The [Solicitation] stated that "To receive consideration for award, a rating of no less than [']Satisfactory['] must be achieved for the Technical and Corporate Experience Factors." For the Corporate Experience Factor, one quoter, PwC, earned confidence ratings of Satisfactory or above. For the Technical Factor, only one quoter, PwC, achieved a rating of Satisfactory or above. *As a result, all quoters are ineligible for award except for PwC.*

The [VA] provided in the [S]olicitation that it "intends to establish a BPA and award [Task ]Order [One] without further communicating with [c]ontractors." Based on the evaluations of each quote against all evaluation criteria, *the [CO] has determined that award can be made on the basis of the initial quotes to PwC and that it is in the best interest of the [VA] to do so.* Although, four of the five quoters presented problems within their technical [proposals] and [Task Order One] pricing quotes that raised concerns, it was determined by the [CO] that *discussions would only allow the unsuccessful quoters to better their technical quotes and pricing to become more competitive with PwC and not actually provide any real benefit to the [VA].* Several quoters provided ██████████████████████████████ ██████████████████████ based on the scope and methodology provided. *Enough detailed information was provided to the quoters throughout the*

*solicitation for them to understand the importance of staffing and the level of effort/methodology needed to accomplish the stated tasks and it would be unfair to PwC for properly following the [S]olicitation['s] requirements, by opening discussions and allowing quoters a second chance.*  In addition, since every quoter other than PwC received a less than satisfactory rating for corporate experience, they would not have been eligible for award if discussions for technical and price were opened.

PwC's technical quote was good, with many strengths identified in their quote that will benefit [the] VA.  They provided a superb delineation ██████████ ████████████████████.  PwC made an effort to clearly distil[l] and detail the composition of the individual VISN . . . teams.  *The other vendors* ████████████████████████. PwC's detailed labor mix of ████████████ ██████████████████████████████████ *is in line with the level of effort experienced in the Pilot [S]tud[y]*, and more importantly in line with what would be expected of a contract of this scale.

PwC's corporate experience was stronger than that of each of the other [q]uoters.  PwC's corporate experience examples demonstrated comparable scale and complexity to the [MAHSO P]roject.  Additionally, the corporate experience examples demonstrated national scope, and included experience relevant to all the critical portfolios.  The relevancy of PwC's experience will translate into a reduction in overall project risk and reduced risk of a delayed National Realignment Strategy.

*PwC's past performance was relevant with high quality, and resulted in low past performance risk.*

\*      \*      \*

PwC's [Task Order One] price is fair and reasonable and an excellent value to the [VA].  Its price is ██████████████████████████████. At the same time, the hours are ████████ to the [VA's] original expectation.

Tab 18, AR 737–38 (emphasis added).

Accordingly, the CO concluded that

PwC[']s quote is technically the strongest among all quotes and its corporate experience offers to the [VA] the greatest level of confidence.  Its past performance offers low risk to the [VA] due to the recency, relevance, and quality of its past work. . . . Its fair and reasonable price is supported by an appropriate labor mix and level of effort to perform the work under [Task Order One].  Its proposed BPA hourly rates are ████████ published GSA schedule rates for the base and all

Option Periods.  No other quoter, based on evaluation results, is eligible for award. PwC's quote is therefore the best value to the [VA].

\* \* \*

The [VA] will therefore establish a [BPA] with [PwC] covering a base period and two option periods. . . . The estimated BPA amount will be established at $110,000,000.00 to reflect BPA [task orders] over the base and two option periods.

[Task Order One] will be awarded to PwC in the amount of $11,981,646.00. Fiscal Year 2017 funds are available to cover the price for [Task Order One].

Tab 18, AR 738.

On August 31, 2017, the VA issued PwC a "Notification of BPA Award," indicating that PwC was the successful awardee.  Tab 23, AR 814–17.  The CO asked PwC to "sign [the task order] and return [it] in an expedited manner in order to allow for a September 1st award."  Tab 23, AR 816–17.

On September 1, 2017, PwC was awarded the BPA, including Task Order One, Order No. VA101F-17-J-3076 under BPA No. VA101F-17-A-3074 (the "MAHSO Contract").[15]  Tab 20, AR 752; Tab 21, AR 799.  On that same day, the VA issued E&Y a "Notification to Unsuccessful Offerors," stating E&Y[16] was "an unsuccessful offeror" and identifying PwC as the awardee.  Tab 24, AR 818.

---

[15] PwC's proposal assumed that the "VA [would] support the proposed VISNs ▇▇▇, and ▇ being performed in [Task Order One] to help meet the accelerated timeline of Phase 1 delivery.  These proposed VISNs represent ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."  Tab 11, AR 587.  The proposal also assumed that "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."  Tab 11, AR 587.

[16] The VA's September 1, 2017 letter to E&Y mistakenly referred to E&Y as "Deloitte," stating that "[t]his letter constitutes official notification to *Deloitte* . . . that it is an unsuccessful offeror."  Tab 24, AR 818 (emphasis added).

The following court exhibit depicts a timeline of the Pilot Study and the MAHSO procurement.

**PILOT STUDY AND MAHSO PROCUREMENT TIMELINE**



## II.    PROCEDURAL HISTORY.

On September 25, 2017, E&Y ("Plaintiff") filed a Complaint ("Compl.") in the United States Court of Federal Claims alleging that the VA improperly awarded PwC the MAHSO Contract, because: (1) the VA's evaluation of E&Y's proposal was "arbitrary, capricious, and lacked reason," Compl. ¶¶ 75–92; (2) the VA's decision to issue the award to PwC "involved [the] application of . . . unstated evaluation criteri[a]," Compl. ¶¶ 93–103; (3) PwC is "ineligible for award[,] because of . . . OCI[s]," Compl. ¶¶ 104–15; (4) the VA's evaluation of PwC's proposal was "unreasonable," Compl. ¶¶ 116–23; and (5) the VA's "[best value trade-off] determination is arbitrary, capricious, and lacks a rational basis." Compl. ¶¶ 124–28. ECF No. 1. On that same day, Plaintiff filed a Motion For Protective Order. ECF No. 5.

On September 26, 2017, the court issued a Protective Order. ECF No. 8. On that same day, the court issued an Order directing PwC, "as a prospective intervenor," to comply with the same terms and conditions set forth in the Protective Order. ECF No. 9.

On September 27, 2017, PwC filed an unopposed Motion To Intervene. ECF No. 15. On that same day, the court issued an Order granting PwC's Motion To Intervene pursuant to Rule of the United States Court of Federal Claims ("RCFC") 24(a)(2). ECF No. 21.

On September 28, 2017, the court issued an Order reflecting the VA's representation that it would not "permit the performance of any work under either BPA [No.] VA101F-17-A-3074 or . . . [O]rder [No.] VA101F-17-J-3076 prior to and including December 1, 2017." ECF No. 22.

On October 3, 2017, the Government filed an unopposed Motion To Remand requesting the court to "remand this case to the [VA] . . . for 14 days to reconsider, and to make further inquiry regarding, certain allegations of [an OCI] . . . contained in the [C]omplaint[.]" ECF No. 24.

On October 4, 2017, the court issued an Order remanding this case to the VA for fourteen (14) days to allow the CO to investigate potential OCIs and consider whether remedial measures were necessary and directing the "parties [to] file a Joint Status Report with the court on, or by, October 20, 2017[.]" ECF No. 25. On that same day, the Clerk of Court issued a Remand Letter to the VA. ECF No. 26.

On October 18, 2017, the Government filed an unopposed Motion To Extend The Voluntary Remand requesting the court to extend the remand until October 25, 2017. ECF No. 27. On that same day, the court issued an Order granting the Government's Motion To Extend The Voluntary Remand and directing the "parties [to] file a Joint Status Report with the court on, or by, October 27, 2017[.]" ECF No. 28.

On October 27, 2017, the parties filed a Joint Status Report, wherein the parties provided the CO's "OCI Assessment," proposed a briefing schedule, and indicated that the VA would voluntarily continue to stay performance through January 12, 2018. ECF No. 29. The CO's OCI Assessment stated, in part, as follows:

> During planning activities associated with the [MAHSO Solicitation], the [VA] . . . informed the CO on or around May 17, 2017, that . . . Craddock . . . , with PwC as a sub-contractor, was currently working on [the P]ilot [S]tudy . . . under

contract # VA101F-17-C-2843 [and] was performing market analysis activities and developing the [M]ethodology listed in the [SOW] that would be used for the upcoming [MAHSO Project].   Under th[e P]ilot [S]tudy [C]ontract, . . . Craddock . . . worked closely with the [VA], off-site, using [g]overnment issued data from three out of ninety [six] geographically unique locations (markets) the VA serves . . . to develop a prototype for Healthcare Delivery System Design.  The prototype was refined through extensive market analysis activities and [VA] oversight resulting in [the] final developed [M]ethodology to be used as a guide for future consulting firms to follow and maintain consistency during the anticipated national "roll out" of ninety [six] market-level assessments needed to inform the [VA] for creation of [the] National Realignment Strategy.

Other than working closely with the [VA] to provide the [M]ethodology to be used as a guide for market analysis activities, . . . Craddock . . . would not be involved in developing the procurement package, oversight, provide expertise during the BPA market assessments, or assist in establishing the resulting National Realignment Strategy.  Issues identified during the initial study and ongoing activities to develop the [M]ethodology helped the [VA] define the SOW based on their own experience, but . . . Craddock . . . did not have a hand in or provide input for the SOW's development, other than developing the [M]ethodology itself.

The [VA] further informed the [CO] that . . . Craddock . . . will likely bid as a sub-contractor on the subject anticipated acquisition . . . . After being informed of . . . Craddock['s] . . . involvement, and gaining a better understanding of the [M]ethodology, it was advised to the [VA] around the beginning of June 2017 while developing the solicitation package by the CO, that the [M]ethodology should be provided to the market in order to avoid an unfair competitive advantage situation or the appearance of one.    The [VA] agreed and worked diligently with . . . Craddock . . . to complete the [M]ethodology since it was not completed at the time of procurement package receipt by the CO.

*While the [M]ethodology was not complete at the time of solicitation issuance, due to strict timelines set forth for this procurement it was discussed with the [VA] and determined by th[e] CO, that the SOW and attached documentation had enough information for a [prospective offeror] to provide a quote, even without the [M]ethodology, the SOW was developed based on the extensive knowledge the [VA] gained during the oversight of the pilot study contract.  Sufficient information was determined based on the premise that the SOW provided enough information on the services required without including the [M]ethodology and any [offeror] with VA experience applying basic market analysis techniques, as required by the [S]olicitation at the time, would be on equal ground.  Because of this, the [S]olicitation was issued without the [M]ethodology and the [M]ethodology was later included under Amendment A00002.*

Additionally, several other steps were taken prior to solicitation issuance to avoid any OCI concerns or the appearance of [an] OCI by developing the

procurement package in house (by the [VA]), making revisions to and broadening the . . . [SOW] based on CO and [VA] input, and the Inclusion of VAAR provision 852.209-70 ORGANIZATIONAL CONFLICTS OF INTEREST in the [S]olicitation.   After the [S]olicitation was issued, the CO provided Craddock['s] . . . information to the market under Amendment A00001 as a response to Requests for Information[.]

*   *   *

Based on the above review of Craddock['s] . . . pilot contract . . . , the CO determined that by providing a quote for [the MAHSO S]olicitation . . . , the contractor for the pilot study, . . . *Craddock . . . and their sub-contractor, PwC, other than having prior knowledge of the method for analysis, would have no other competitive advantage.  The SOW was not developed by . . . Craddock . . . or PwC . . . , nor was any other portion of the solicitation other than the [M]ethodology, as the majority of the solicitation was developed by the CO with input from the [VA].  The developed evaluation factors listed in the solicitation and used during the source selection process were general in nature and not unique regarding the pilot contract other than the technical evaluation criteria that discussed understanding methods of approach and how to staff those methods.  In order to minimize any OCI concerns that may refer to the technical evaluations, . . . the [M]ethodology was issued to potential quoters in order to mitigate any advantage or perceived advantage by PwC and . . . Craddock . . . for work on the pilot contract.*

In addition, the [*Pilot Study Data*] provided to PwC and . . . Craddock . . . during the pilot contract *was unique to the specific markets and would not benefit them in providing a quote for the resulting solicitation* as each market is independent and the general approach for analyzing each market is specifically spelled out in the [M]ethodology provided to all potential quoters.  The development of the [M]ethodology was performed under the strict oversight and control of [VA] officials indicating . . . Craddock . . . participated in the development of the [M]ethodology with the [VA] . . . to create an end product that could be used on future market analysis activities.

Based on the facts above, [and] the supporting documents . . . my analysis shows that FAR 9.505-2(a)(3)[17] is relevant, there is no evidence that [VA] worked

---

[17] FAR 9.505-2(a)(3) provides that

[i]n development work, it is normal to select firms that have done the most advanced work in the field.  *These firms can be expected to design and develop around their own prior knowledge.*  Development contractors can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the [g]overnment.  In many instances the [g]overnment may have financed the development.  *Thus, while the development contractor has a*

with . . . Craddock . . . to develop the procurement package, other than the [M]ethodology, and *while the development contractor has a minor competitive advantage* because of that, it has been determined by the CO that *it is an unavoidable one that is not considered unfair*; hence no prohibition should be imposed.

*        *        *

To minimize any OCI concerns that may refer to the technical evaluations, . . . the *[M]ethodology was issued to all potential quoters in order to mitigate any advantage or perceived advantage by PwC and . . . Craddock . . . for work on the pilot contract. The [M]ethodology is a straightforward step-by-step process that outlines the high level approach, activities, and data that will be used for each market assessment and was issued to all vendors to mitigate any OCI concerns seven days prior to proposals being due.* After issuance, there were no further questions or requests for time extensions due to the new information. This led to the CO determination that the vendors had enough time to evaluate the [M]ethodology and incorporate it into their quote.

*        *        *

The . . . [CO] . . . has considered the facts surrounding the acquisition and finds no significant [OCI] exists. *If an advantage for either . . . Craddock . . . or PwC exists, it is a fair competitive advantage under FAR 9.505-2(a)(3)* as an incumbent contractor due to the success of the [P]ilot [S]tudy and any additional instances of OCI were mitigated by the multiple steps addressed above, most importantly by providing extensive information to all vendors under the competitive procurement. It is understood by the CO that not including the [M]ethodology with the solicitation when it was issued on July 7, 2017 may have raised some initial concerns. *But this concern was mitigated since it was issued under [A]mendment A00002 seven days prior to quotes being due, it is a straightforward methodology that gives clear direction and no vendor expressed concerns about the timeframe after issuance.*

Tab 27, AR 831–37 (emphasis added).

On October 30, 2017, the court issued an Amended Scheduling Order. ECF No. 30.

On November 2, 2017, the Government filed the Administrative Record. ECF No. 31. On November 8, 2017, the Government filed a First Corrected Administrative Record. ECF No. 32.

---

*competitive advantage, it is an unavoidable one that is not considered unfair; hence no prohibition should be imposed.*

48 C.F.R. § 9.505-2(a)(3) (emphasis added).

On November 20, 2017, Plaintiff filed a Motion For Leave To File Amended Complaint. ECF No. 36.  On that same day, Plaintiff filed a Motion For Judgment On The Administrative Record.  ECF No. 37.

On November 21, 2017, the court issued an Order granting Plaintiff's November 20, 2017 Motion For Leave To File Amended Complaint.  ECF No. 38.  On that same day, the Government filed a Second Corrected Administrative Record.  ECF No. 39.

On November 29, 2017, PwC filed an unopposed Motion For Modification Of Scheduling Order.  ECF No. 41.  On November 30, 2017, the court issued an Order granting PwC's Motion For Modification Of Scheduling Order.  ECF No. 42.  On that same day, Plaintiff filed an Amended Complaint ("Am. Compl."), further detailing Counts I and IV.  ECF No. 43.

On December 8, 2017, the Government filed a Response And Cross-Motion For Judgment On The Administrative Record.  ECF No. 45.  On that same day, PwC filed a Cross-Motion For Judgment On The Administrative Record.  ECF No. 46.

On December 14, 2017, Plaintiff filed a Reply And Opposition To Defendant's And Defendant-Intervenor's Cross-Motions For Judgment On The Administrative Record.  ECF No. 48.

On December 20, 2017, the Government filed a Reply.  ECF No. 50.  On that same day, PwC filed a Reply.  ECF No. 51.

On January 12, 2018, the Government filed a Notice of Voluntary Stay Extension indicating that the VA would extend the voluntary stay of performance "for thirty-one days, to and including Monday, February 12, 2018."  ECF No. 52.

On February 12, 2018, the Government filed a Notice Regarding Extension Of Voluntary Stay stating that the VA would extend the voluntary stay of performance "through Tuesday, February 20, 2018."  ECF No. 53.

On February 15, 2018, the court issued an Order reflecting the Government's representation that the VA would extend the voluntary stay of performance through Tuesday, February 20, 2018.  ECF No. 54.

On February 21, 2018, the Government filed another Notice Regarding Extension Of Voluntary Stay stating that the VA would extend the voluntary stay of performance "for three days, to and including Friday, February 23, 2018."  ECF No. 55.

On February 22, 2018, the court issued an Order reflecting the Government's representation that the VA would extend the voluntary stay of performance through Friday, February 23, 2018.  ECF No. 56.

## III.    DISCUSSION.

### A.    Subject Matter Jurisdiction.

Subject matter jurisdiction is a threshold issue that a court must determine at the outset of a case.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884))).

Pursuant to the Administrative Dispute Resolution Act of 1995, the United States Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a [f]ederal agency or proposals for a proposed contract or to a proposed award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (emphasis added).

In this case, E&Y's November 30, 2017 Amended Complaint alleges that: (1) the VA's evaluation of E&Y's proposal was "arbitrary, capricious, and lacked reason," Am. Compl. ¶¶ 75–94; (2) the VA's decision to issue the award to PwC "involved [the] application of . . . unstated evaluation criteri[a]," Am. Compl. ¶¶ 95–105; (3) PwC is "ineligible for award because of . . . OCI[s]," Am. Compl. ¶¶ 106–17; (4) the VA's evaluation of PwC's proposal was "unreasonable," Am. Compl. ¶¶ 118–27; and (5) the VA's "[best value trade-off] determination is arbitrary, capricious, and lacks a rational basis." Am. Compl. ¶¶ 128–32.

For these reasons, the court has determined that it has subject matter jurisdiction, under 28 U.S.C. § 1491(b)(1), to adjudicate the claims alleged in E&Y's November 30, 2017 Amended Complaint.

### B.    Standing.

"Standing is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  "The party invoking federal jurisdiction bears the burden of establishing the[ ] elements [of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  To establish standing under 28 U.S.C. § 1491(b)(1), a complaint must allege sufficient facts to show that the plaintiff: (1) is an interested party; and (2) was prejudiced by alleged errors in the procurement process. *See Myers*, 275 F.3d at 1370 (holding that standing under § 1491(b)(1) is limited to "interested parties"); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378–79 (Fed. Cir. 2009) ("[T]he question of prejudice goes directly to the question of standing[.]").

The United States Court of Appeals for the Federal Circuit has held that the term "interested party" in 28 U.S.C. § 1491(b)(1) "is construed in accordance with the Competition in Contracting

Act." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing 31 U.S.C. §§ 3551–3556). Therefore, to qualify as an interested party, "a protestor must show that: (1) it was an actual or prospective bidder or offeror[;] and (2) it had a direct economic interest in the procurement or proposed procurement." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008). A protestor has a "direct economic interest" if, after a successful protest, "the government would be obligated to rebid the contract, and [the protestor] could compete for the contract once again." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001).

In this case, E&Y submitted a timely and "responsive" proposal for the MAHSO Project. Tab 11, AR 486595. Therefore, E&Y was "an actual . . . offeror." *See Distributed Sols.*, 539 F.3d at 1344. In addition, E&Y's November 30, 2017 Amended Complaint alleges that the VA's decision to award the MAHSO Contract to PwC violated the FAR and was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Am. Compl. ¶¶ 75–132. If established, these allegations would render the VA's decision unlawful and "the [VA] would be obligated to rebid the contract." *See Impresa*, 238 F.3d at 1334. Accordingly, E&Y has established that it is an "interested party." *See Distributed Sols.*, 539 F.3d at 1344.

To establish standing, a protestor also must demonstrate prejudice. *See Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). "A party has been prejudiced when it can show that[,] but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378; *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) ("To establish 'significant prejudice' [the protestor] must show that there was a 'substantial chance' it would have received the contract award[,] but for the [alleged] errors[.]"). Our appellate court has held that the test for prejudice "is more lenient than showing actual causation," because the plaintiff need not "show[] that[,] but for the errors[, it] would have won the contract." *Bannum*, 404 F.3d at 1358 (emphasis added). Instead, the complaint must allege that the plaintiff has a "greater than insubstantial chance of securing the contract if successful on the merits of the bid protest." *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("In other words, the protestor's chance of securing the award must not have been insubstantial.")

In this case, the CO determined that only PwC was eligible for award of the MAHSO Contact. Tab 18, AR 737. E&Y's November 30, 2017 Amended Complaint, however, alleges that PwC was "ineligible for award because of . . . OCI[s]" and that the CO's failure to timely and adequately mitigate these OCIs violated FAR 9.504(a) and 9.505. Am. Compl. ¶¶ 106–17. In addition, the Amended Complaint alleges that the SSEB's evaluation of E&Y's proposal was "arbitrary, capricious, and lacked reason." Am. Compl. ¶¶ 75–94. Finally, the Amended Complaint alleges that the CO's "best value trade-off" determination violated FAR 8.405-3. Am. Compl. ¶¶ 128–32. If these FAR violations are established, PwC would not be eligible for an award. The remaining offerors, Deloitte, E&Y, Huron, and McKinsey, however, each received identical ratings from the SSEB. Tab 18, AR 736 (table summarizing the SSEB's "findings from evaluations"). As such, E&Y would have an equal chance, *i.e.*, a "substantial chance," of being awarded the MAHSO Contract. *See Bannum*, 404 F.3d at 1353; *see also Cyios Corp. v. United States*, 122 Fed. Cl. 726, 735 (Fed. Cl. 2015). Under these circumstances, E&Y has "demonstrate[d] prejudice." *See Myers*, 275 F.3d at 1370.

For these reasons, the court has determined that E&Y has standing to challenge the VA's award of the MAHSO Contract.

### C.   Whether The United States Department of Veterans Affairs's Award to PricewaterhouseCoopers Public Sector, LLP Was Contrary To Law, Not Rational, Or Arbitrary And Capricious.

#### 1.   Standard Of Review For Judgment On The Administrative Record, Pursuant To RCFC 52.1.

In this case, the parties filed Cross-Motions For Judgment On The Administrative Record, pursuant to RCFC 52.1. The United States Court of Appeals for the Federal Circuit requires that the court treat a judgment on the administrative record as if it were an expedited trial on the record. *See Bannum*, 404 F.3d at 1356. Therefore, the existence of material issues of fact does not prohibit the court from granting a RCFC 52.1 motion. *Id.* at 1354. Instead, the court can base a determination on "factual findings from the record evidence." *Id.*

#### 2.   Standard Of Review For A Bid Protest.

Congress amended the Tucker Act through the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), to authorize the United States Court of Federal Claims to adjudicate bid protests under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citations omitted)).

Therefore, the trial court's first responsibility in a bid protest is to determine whether a federal agency violated a federal statute or regulation in the procurement process and whether any such violation was prejudicial. *See Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations" (internal quotation marks and citations omitted)).

If no prejudicial violation of law or regulation is found, however, the court next is required to determine whether the agency decision evidences a rational basis. *See Savantage Fin. Servs. Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (holding that a court "must sustain an agency action unless the action does not evidence rational reasoning and consideration of relevant factors" (quotations omitted)); *see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (holding that as long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld). In this respect, "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa*, 238 F.3d at 1332. "Accordingly, the test for reviewing courts is to determine

whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332–33 (internal quotations omitted).

Finally, the court is required to ascertain whether the federal agency otherwise acted in an arbitrary or capricious manner with respect to the procurement at issue. *See Banknote*, 365 F.3d at 1350 ("[A] reviewing court shall set aside the agency action if it is 'arbitrary, capricious, [or] an abuse of discretion.'"). The United States Supreme Court has held that a federal agency's decision is "arbitrary and capricious," when an agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 3. Ernst & Young, LLP's Amended Complaint.

Count I of E&Y's November 30, 2017 Amended Complaint alleges that "the VA's evaluation of E[&]Y's proposal was arbitrary, capricious, and lacked reason." Am. Compl. ¶¶ 75–94. The VA arbitrarily evaluated portions of E&Y's proposal, resulting in the wrongful assignment of marginal ratings under the Technical and Corporate Experience Factors. Am. Compl. ¶¶ 75–90. The VA also ignored several circumstances surrounding the Solicitation that necessitated discussions. Am. Compl. ¶ 92. Finally, the VA "unreasonably concluded that it could not determine whether E[&]Y's [Task Order One] fixed price of $████████ was fair and reasonable." Am. Compl. ¶ 93.

Count II of E&Y's November 30, 2017 Amended Complaint alleges that the VA employed unstated evaluation criteria to analyze E&Y's proposal. Am. Compl. ¶¶ 95–105. The VA's basis for evaluating proposals is limited to information and standards stated in the Solicitation. Am. Compl. ¶ 97. Despite the Solicitation requiring five-person VISN teams, the VA assigned E&Y "a weakness for dedicating ████████ team to each VISN." Am. Compl. ¶¶ 98–102. Without providing staffing guidelines or team lead specifications, the VA assigned E&Y additional weaknesses for ██████████████████████████████████ ████████" Am. Compl. ¶¶ 103–04. "The VA's improper application of unstated criteria" led to E&Y's proposal not being eligible for an award. Am. Compl. ¶ 105.

Count III of E&Y's November 30, 2017 Amended Complaint alleges that "PwC is ineligible for award because of . . . OCI[s]." Am. Compl. ¶¶ 106–17. Craddock and PwC had an existing contract with the VA to develop the Methodology, *i.e.*, the Pilot Study Contract. Am. Compl. ¶ 108. PwC's "deep, unequal, and unfair access to non-public information that other [offerors] did not have[,]" presented an unequal access to information OCI. Am. Compl. ¶ 114. Months of early access to the Methodology and the underlying Pilot Study Data allowed PwC to use additional information relevant to the Solicitation and better understand the Solicitation's requirements. Am. Compl. ¶ 115. "Further, . . . Craddock['s] . . . work in developing the [M]ethodology meant that it drafted a key aspect of the [Solicitation's SOWs]. Thus, PwC had both unequal access to information and biased ground rules OCIs." Am. Compl. ¶ 114.

Count IV of E&Y's November 30, 2017 Amended Complaint alleges that "the [SSEB's] evaluation of PwC's proposal was unreasonable" because the SSEB arbitrarily evaluated the

Technical, Corporate Experience, and Past Performance Factors of PwC's proposal. Am. Compl. ¶¶ 119–24. PwC's inexperience in conducting federal health market assessments, labor inefficiencies, and ████ price difference called for the SSEB's assignment of weaknesses to PwC's proposal. Am. Compl. ¶¶ 120–22. Additionally, the SSEB "unreasonably credited PwC with the [c]orporate [e]xperience and [p]ast [p]erformance of its affiliate ████████████" and "failed to reject PwC's proposal as ineligible for its inclusion of assumptions that contradict[ed] requirements of the [Solicitation]." Am. Compl. ¶¶ 123–24.

Count V of E&Y's November 30, 2017 Amended Complaint alleges that "[t]he VA's [best value trade-off] determination is arbitrary, capricious, and lacks a rational basis." Am. Compl. ¶¶ 128–32. Contracting officers have broad discretion to conduct a best value trade-off determination, provided that the determination is not arbitrary and capricious or a violation of law. Am. Compl. ¶ 130. By applying unstated evaluation criteria and ignoring PwC's ████ higher price, the VA "conducted an unreasonable [best value] trade[-]off [determination]." Am. Compl. ¶ 131.

### 4. Ernst & Young, LLP's Motion For Judgment On The Administrative Record.

#### a. The Source Selection Evaluation Board's Evaluation Failed To Comply With The Solicitation Or Otherwise Was Arbitrary And Capricious.

E&Y argues that federal agencies are required to evaluate proposals in accordance with the solicitation. Pl. Br. at 18–19. The MAHSO Solicitation's SOWs required six VISN teams of five members each to conduct site visits and assessments. Pl. Br. at 19. Pursuant to this requirement, E&Y "proposed to provide ████████████████████████ in its . . . Staffing/Management proposal." Pl. Br. at 19 (emphasis and bold in original). The SSEB, however, assigned E&Y a weakness, based on the proposed number of team members in each VISN team although E&Y's proposed "staffing level" met the requirements of the Solicitation. Pl. Br. at 19–20. In addition, notwithstanding the Solicitation's requirement that one Architect and one Healthcare Planner would lead each VISN team, the SSEB assigned E&Y's proposal an additional weakness for ████████████████████████. Pl. Br. at 20. Moreover, although E&Y's proposal included ████████████████████████████████ ██████, the SSEB assigned E&Y technical weaknesses for ████████████████████ ██████████████████████████████████████. Pl. Br. at 23–24. The SSEB's assignment of these weaknesses was inconsistent with the Solicitation's evaluation criteria and also unfairly affected the evaluation of every offeror, except PwC. Pl. Br. at 21.

The SSEB also failed to evaluate PwC's proposal as required by the Solicitation, by crediting PwC with the corporate experience and past performance of ████████ even though the Solicitation limited the SSEB's evaluation to the "prime contractor" and "major subcontractors." Pl. Br. at 34. PwC did not list ████████ as a "major subcontractor" in its proposal, but the SSEB nevertheless credited PwC with the past performance of ████████. Pl. Br. at 35–36. In addition, despite the SSEB's indication that PwC's staffing levels ████ ██████, the SSEB assigned PwC a "Good" rating under the Technical Factor. Pl. Br. at 43.

Finally, in evaluating PwC's Price, the SSEB also overlooked the ████████████ difference between PwC's proposed price and that of all the other offerors.  Pl. Br. at 44.

> **b.**   **PricewaterhouseCoopers Public Sector, LLP's Assumptions Did Not Comply With The Solicitation.**

PwC's proposal failed to comply with the Solicitation by making "two substantial . . . assumptions that conflict with the [Solicitation] and [that] should have rendered PwC's proposal unacceptable."  Pl. Br. at 38.  Specifically, PwC's proposal assumed that data provided by the VA ████████████████████" and that the VA would "support [PwC's] proposed VISNs."  Pl. Br. at 38–39.  These assumptions, however, are inconsistent with the Solicitation, because the VA "did not warrant" ████████████ to be provided and did not indicate which VISNs would be supported in Task Order One.  Pl. Br. at 38–40.  Consequently, PwC's proposal was unacceptable.  Pl. Br. at 37–38; *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals.").

> **c.**   **The Contracting Officer Failed To Conduct Discussions.**

Although the VA reserved the right to award the MAHSO Contract without conducting discussions, an agency's discretion not to engage in discussions must be "reasonably based on the particular circumstances of the procurement, including consideration of the proposals received and the basis for selection decision."  Pl. Br. at 40–41 (quoting *Day & Zimmerman Servs. v. United States*, 38 Fed. Cl. 591, 604 (Fed. Cl. 1997)).  E&Y argues that the discrepancies in proposed pricing and the fact that three of the "largest and most successful consulting firms in the world" were determined not to be eligible for a contract award, rendered the CO's decision to make an award without conducting discussions arbitrary and capricious.  Pl. Br. at 42.  Specifically, the VA failed to "notice that it potentially could save the taxpayers more than $████████ due to the 'excessive' staffing proposed by PwC, if it reopened discussions."  Pl. Br. at 42.

> **d.**   **The Contracting Officer Failed Adequately To Mitigate Organizational Conflicts Of Interest.**

E&Y also argues that the CO failed adequately to mitigate two OCIs.  Pl. Br. at 46.  First, Craddock and PwC had access to the Pilot Study Data, which was not disclosed to the other offerors.  Pl. Br. at 47.  VA correspondence shows that VA data sets and other "proprietary" non-public government information was used to create the Methodology.  Pl. Br. at 48–49 (citing Tab 27, AR 978).  Although the CO ultimately provided the Methodology to all prospective offerors, seven days before proposals were due, the CO's failure to provide all the offerors with the underlying Pilot Study Data resulted in an unequal access to information OCI.  Pl Br. at 50–51.  In addition, PwC also is ineligible for an award, because of a biased ground rules OCI.  Pl. Br. at 51.  The VA admitted that the Methodology developed by Craddock and PwC was the basis for the Solicitation's SOWs and evaluation criteria, but decided that no conflict existed, because PwC and Craddock qualified as "development contractor[s]" under FAR 9.505-2.  Pl. Br. at 53–56.  PwC's work on the Pilot Study, however, "fits neatly under the definition for 'nondevelopmental' work

set forth in . . . FAR [2.101]" rendering PwC not eligible to work on the MAHSO Project.  Pl. Br. at 56.  Therefore, E&Y contends that the VA did not mitigate two OCIs that gave PwC an unfair competitive advantage over E&Y and the other offerors.  Pl. Br. at 57.

### e.    Injunctive Relief Is Appropriate.

Because of these FAR violations and arbitrary and capricious decisions made by the SSEB and CO, E&Y argues that it has established the "requirements for permanent injunctive relief."  Pl. Br. at 58.  "A protest[o]r suffers irreparable injury when it has been deprived the opportunity to compete fairly for a contract[, and] . . . the VA has deprived E[&]Y of the opportunity to compete fairly in a number of ways."  Pl. Br. at 59.  In addition, "[t]he public has no interest in paying PwC a ████ higher price[,] based upon an unreasonable and unequally applied evaluation."  Pl. Br. at 59.  The public does, however, have an interest in "insuring that public officials treat contractors fairly and generally obey procurement laws and regulations."  Pl. Br. at 59 (quoting *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57 (Fed. Cl. 2005)).  In addition, "the balance of hardships falls squarely in favor of injunctive relief."  Pl. Br. at 60.  Specifically, "[i]njunctive relief would not harm the [VA's] interests at all.  Indeed, the [VA] would avoid the wasteful performance of PwC at an exorbitant cost."  Pl. Br. at 60.  And, "[g]iven the irreparable harm to E[&]Y caused by the deprivation of the opportunity to compete fairly for th[e MAHSO C]ontract, the balance of interests falls decidedly in E[&]Y's favor."  Pl. Br. at 60.

### 5.    The Government's Response And Cross-Motion For Judgment On The Administrative Record.

#### a.    The Source Selection Evaluation Board's Evaluation Was Proper.

The Government responds that, because procurement officials apply technical knowledge in evaluating proposals, the courts must review procurement decisions with a great deal of deference.  Gov't Br. at 19.  This is particularly true in this case, where E&Y failed to meet the burden of proving that the VA improperly evaluated E&Y's proposal.  Gov't Br. at 19; *see also CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717 (Fed. Cl. 2011) ("[T]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of the procurement officials, and thus reviewing courts give [the] greatest deference possible to these determinations.").



The SSEB properly evaluated E&Y's technical proposal as "Marginal."  Gov't Br. at 18–19.  Although the Solicitation provided that there must be "at least six teams of five health care planners and data analysts," the qualifier "at least" modified the phrase "five health care planners and data analysts."  Gov't Br. at 21.  Therefore, E&Y's proposed "████████████████ ████████████" reflect E&Y's misunderstanding of the scope of the Task Order One SOW and justify E&Y's poor ratings.  Gov't Br. at 21–22.  The SSEB's ratings also were justified, because portions of E&Y's proposal ████████████████████████████████████████ ████████████.  Gov't Br. at 22–23.  Although the SSEB believed that PwC's proposed staffing levels ████████████████, the SSEB determined that PwC exhibited ████████ ████████████████████████.  Gov't Br. at 31.  Moreover, the VA's reference to "Deloitte" in E&Y's technical evaluation was a typographical

error, evidenced by the absence of any reference to a similar weakness in Deloitte's evaluation. Gov't Br. at 23–24.

In addition, the SSEB properly evaluated E&Y's corporate experience. Gov't Br. at 24. E&Y's failure to focus on ███████████ led the SSEB to conclude that E&Y lacked adequate experience. Gov't Br. at 24. Therefore, E&Y was found not to be eligible for an award, because the SSEB properly determined that E&Y's proposal received less than "Satisfactory" technical and corporate experience ratings. Gov't Br. at 28.

The SSEB properly also rated E&Y's past performance as entailing a "Moderate Risk," because E&Y's past performance examples "███████████████." Gov't Br. at 30 (quoting Tab 14, AR 643). And, the SSEB correctly credited PwC with the corporate experience and past performance of ███████████, because PwC's proposal confirmed the availability of ███████████ resources and "a contracting officer has *discretion to take offerors at their word* that the resources of their affiliates will be made available." Gov't Br. at 32–33 (quoting *PricewaterhouseCoopers Pub. Sector, LLP v. United States*, 126 Fed. Cl. 328, 353 (Fed. Cl. 2016)). Moreover, the VA's overall evaluation of PwC's proposal properly concluded that PwC's price was "fair and reasonable," because it offered an "excellent value," including ███████████████████. Gov't Br. at 35–36.

### b.    PricewaterhouseCoopers Public Sector, LLP's Assumptions Complied With The Solicitation.

The Government argues that the VA also was free to accept the assumptions included in PwC's proposal, because they did not violate or conflict with the terms of the Solicitation, since the Solicitation "sa[id] nothing about which VISNs would be included in [Task Order One]" and the "VA [did not] ███████████████." Gov't Br. at 37.

### c.    The Contracting Officer Was Not Required To Conduct Discussions.

The Government argues that FAR Part 15 is inapplicable in this case, because it does not govern BPAs. Gov't Br. at 38 (citing FAR 8.404(a)[18]). Moreover, "[w]here the applicable procurement regulations do not require discussions, the procuring agency is not required to conduct them." Gov't Br. at 39. As such, the terms of the Solicitation control the CO's discretion in deciding whether to conduct discussions. Gov't Br. at 38–39. In this case, the CO appropriately proceeded without conducting discussions, because the Solicitation stated that a "[c]ontractor may be eliminated from consideration without further communication[,] if its non-price and/or pricing quotes are not among those [c]ontractors considered most advantageous to the [VA] based on a best value determination." Gov't Br. at 38–39 (quoting Tab 8, AR 269).

---

[18] FAR 8.404(a) provides, in relevant part, that "[p]arts 13 . . . , 14, 15, and 19 . . . do not apply to BPAs[.]" 48 C.F.R. § 8.404(a).

### d.   Ernst & Young, LLP's Organizational Conflict Of Interest Claims Are Untimely And Unsupported.

The Government also argues that E&Y's OCI claims are untimely and not supported. Gov't Br. at 40–43. Requests for information during the solicitation process evidence that prospective offerors, including E&Y, had knowledge of at least Craddock's involvement in developing the Methodology. Gov't Br. at 42 (citing Tab 8, AR 298). The United States Court of Appeals for the Federal Circuit has held that "a party who has the opportunity to object . . . and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently . . . in the [United States] Court of Federal Claims." Gov't Br. at 41 (quoting *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)). The United States Court of Federal Claims has observed that "[l]ogically, the waiver rule . . . applies where a [protestor] fails to raise OCI claims before the close of the bidding process." Gov't Br. at 41 (quoting *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 26, 29 (Fed. Cl. 2017)). As a result, E&Y's OCI claims are waived as a matter of law, because E&Y failed to raise OCI claims prior to close of the MAHSO Solicitation. Gov't Br. at 43. In the alternative, E&Y did not establish that the CO's OCI Assessment and mitigation efforts were "arbitrary, capricious, or otherwise contrary to law." Gov't Br. at 43 (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010)). In addition, because PwC did not assist in preparing the Solicitation's SOWs or gain access to information other than the Methodology, any informational advantage the PwC may have had did not rise to the level of an unfair competitive advantage. Gov't Br. at 45–46.

### 6.   PricewaterhouseCoopers Public Sector, LLP's Response And Cross-Motion For Judgment On The Administrative Record.

PwC emphasizes that the CO's "best value trade-off" determination was reasonable, and thus, E&Y is not entitled to injunctive relief. Int. Br. at 43–44. Although a determination was not required, "because there [was] only one acceptable offeror," the CO nevertheless proceeded to conduct a "best value trade-off" analysis. Int. Br. at 43–44. In this regard, E&Y "failed to demonstrate that the CO erred in evaluating E[&]Y's Technical Approach, Corporate Experience, and Past Performance." Int. Br. at 43. Moreover, the CO also applied the appropriate evaluation criteria in concluding that PwC was the only offeror eligible for an award. Int. Br. at 44.

A party seeking injunctive relief must demonstrate that "it has actually succeeded on the merits." Int. Br. at 44 (quoting *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 322 (Fed. Cl. 2010)). Therefore, E&Y's failure to establish success on the merits bars it from obtaining injunctive relief. Int. Br. at 44–45. In addition, public interest and hardship concerns in this case prevent the court from granting injunctive relief. Int. Br. at 45–46. The public interest is not served by injunctive relief where the VA did not abuse its discretion or act in an arbitrary and capricious manner. Int. Br. at 45–46. In addition, an injunction is not appropriate where it would cause undue hardship to the VA and other interested parties, and the administrative burden of reopening the MAHSO Solicitation would harm veterans by further delaying commencement of the MAHSO Project. Int. Br. at 46.

**7.     Ernst & Young, LLP's Reply In Support Of Motion For Judgment On The Administrative Record And Opposition To The Government's And PricewaterhouseCoopers Public Sector, LLP's Cross-Motions For Judgment On The Administrative Record.**

**a.     The Extent To Which  Will Be Involved Is Uncertain.**

E&Y replies that the VA "improperly credited PwC . . . with the corporate experience and past performance of . . . [███████████]." Pl. Reply at 14.  Although PwC's proposal suggests that ███████████ resources will be available, PwC "lack[s] . . . concrete support for this statement . . . , [and] Reuters News has reported that PwC [US] is selling its government services practice, disproving any assertions that [███████████] . . . will have involvement, let alone 'direct and meaningful involvement,' in PwC['s] . . . performance." Pl. Reply at 17–19 (citing Tab 11, AR 513).

**b.     Ernst & Young, LLP Did Not Waive Organizational Conflict Of Interest Claims.**

E&Y did not waive any OCI claims by protesting the VA's OCI determination after the contract award. Pl. Reply at 28.  The general rule is that "a protestor is not required to protest an agency's OCI determination until after contract award." Pl. Reply at 29 (quoting *REEP, Inc.*, B-290688, 2002 WL 31103566 (Comp. Gen. Sept. 20, 2002)).

In this case, E&Y did not have any knowledge of PwC's involvement in drafting the MAHSO Solicitation or intent to submit a proposal until after the MAHSO Contract was awarded. Pl. Reply at 29 (citing Tab 8, AR 298).  PwC's involvement in the Pilot Study permitted it to gain access to "proprietary" non-public government information that was more than that acquired through "mere incumbency." Pl. Reply at 31 (quoting Gov't Br. at 44).  In addition to the Pilot Study Data, PwC also received information discussed in team and data orientation meetings, internal metrics, and input from VA leadership. Pl. Reply at 31 (citing Tab 27, AR 978–80).  This additional access to specific Solicitation-related information created an unequal access to information OCI that the VA failed to adequately mitigate. Pl. Reply at 31–32.

**c.     Permanent Injunctive Relief Is Appropriate.**

E&Y is entitled to injunctive relief, because it has demonstrated that all offerors did not compete for the MAHSO Contract on a level playing field. Pl. Reply at 34.  Moreover, it is in the public's best interest to "secure the best value for the [VA]" and avoid payment of a ███ price premium. Pl. Reply at 34–35.

**8.     The Government's Reply In Support Of Cross-Motion For Judgment On The Administrative Record.**

The Government adds that the SSEB appropriately evaluated E&Y's past performance examples. Gov't Reply at 8.  The VA conducted a "size, scope, and complexity" analysis of E&Y's past performance examples. Gov't Reply at 9.  E&Y's examples were ███████████ ███████████," particularly when contrasted with the cost

and substance of a "███████████████████████████████████
███████████████████." Gov't Reply at 9.

In addition, PwC appropriately was credited with the corporate experience of ███
████, because the potential divestiture of ██████████ is not "imminent and essentially
certain." Gov't Reply at 12–13.  Thus, ██████████ is available to assist PwC in the MAHSO
Project as a corporate affiliate.  Gov't Reply at 12.

> ### 9.      PricewaterhouseCoopers Public Sector, LLP's Reply In Support Of Cross-Motion For Judgment On The Administrative Record.

PwC adds that the VA appropriately assigned E&Y weaknesses under the Technical Factor.
Int. Reply at 7.  In fact, the "ambiguous and confusing" nature of E&Y's proposal alone merits the
VA's assignment of weaknesses.  Int. Reply at 10.

> ### 10.     The Court's Resolution.

> #### a.      Ernst & Young, LLP Did Not Waive Any Organizational Conflict Of Interest Claims.

In *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), the
United States Court of Appeals for the Federal Circuit held that

> a party who has the opportunity to object to the terms of a government solicitation
> containing a *patent* error and fails to do so prior to the close of the bidding process
> waives its ability to raise the same objection subsequently in a bid protest action in
> the [United States] Court of Federal Claims.

*Id.* at 1313 (emphasis added); *see also Patent*, BLACK'S LAW DICTIONARY (10th ed. 2014)
(defining "patent" as "[o]bvious [or] apparent").

In *CRAssociates*, the United States Court of Federal Claims observed that

> the rationale of *Blue* [*&*] *Gold* [*Fleet*] leads to the conclusion that a contractor
> should not be allowed to protest an agency's failure to identify and mitigate an OCI
> *when the contractor knew about the alleged OCI from the start*, but failed to assert
> it, via protest, prior to the award.

*CRAssociates*, 102 Fed. Cl. at 712 (emphasis added); *see also Concourse Grp.*, 131 Fed. Cl. at 29
("Logically, the waiver rule also applies where a [protestor] fails to raise OCI claims before the
close of the bidding process.").

In this case, prior to the award of the MAHSO Contract, other prospective offerors were
not informed by the CO or otherwise of PwC's involvement in the Pilot Study or intent to bid on
the MAHSO Contract.  Tab 8, AR 298–300, 302.  Nor were other prospective offerors informed
that PwC received "proprietary" non-public government information from the VA that was used
to develop the Methodology, *i.e.*, the Pilot Study Data.  Tab 8, AR 298–300, 302.  Consequently,
neither E&Y nor the other prospective offerors had any information from which they could assert

OCI claims prior to submitting their proposals.   Although one prospective offeror expressed concern that the Pilot Study "contractors" had an unfair competitive advantage (Tab 9, AR 345), the CO represented that "any advantage or perceived advantage" was mitigated by releasing the Methodology, albeit seven days before final offers were due.  Tab 27, AR 833; *see also* Tab 9, AR 345.   The deficiency of this mitigation effort, however, was not immediately recognized, but became apparent only when the proposals were examined and showed that every offeror, except PwC, made identical "mistaken" assumptions in their technical proposals.  Tab 11, AR 519; Tab 18, AR 737.  As such, the bases for E&Y's OCI claims were not "patent . . . prior to the close of the bidding process."  *See Blue & Gold Fleet*, 492 F.3d at 1313.

For these reasons, the court has determined that E&Y did not waive any OCI claims alleged in the November 30, 2017 Amended Complaint.

> **b.   The Contracting Officer Violated FAR 9.504(a), By Failing To Identify, Evaluate, And Mitigate A Significant Unequal Access To Information Organizational Conflict Of Interest Prior To Award Of The Market Area Health System Optimization Contract.**

Count III of E&Y's November 30, 2017 Amended Complaint[19] alleges that "PwC is ineligible for award because of . . . OCI[s]."  Am. Compl. ¶¶ 106–17.  Specifically, the Amended Complaint alleges that "PwC's team had deep, unequal, and unfair access to non-public information that the other [offerors] did not have.  [And, this] non-public information provided PwC with an unfair competitive advantage."  Am. Compl. ¶ 114.  "Thus, PwC had [an] unequal access to information . . . OCI[]."  Am. Compl. ¶ 114; *see also* Pl. Br. at 46.

"An unequal access to information OCI may arise in situations where an offeror, by virtue of [prior] performance on a government contract, obtains access to non-public information that other offerors do not have, which provides it an unfair competitive advantage on a new procurement."  *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 210 (Fed. Cl. 2011) (citing *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (Fed. Cl. 2010), *aff'd* 645 F.3d 1377 (Fed. Cir. 2011)).

FAR 9.504(a) requires a contracting officer to "analyze planned acquisitions in order to . . . *[a]void, neutralize, or mitigate significant potential [OCIs] before contract award*."  48 C.F.R. § 9.504(a) (emphasis added).  To that end, the "contracting officer must analyze each procurement to determine if there are any *potential or actual* OCIs."  *Jacobs Tech.*, 100 Fed. Cl. at 210 (emphasis added).  And, FAR 9.504(a) requires the contracting officer to "[i]dentify and evaluate potential [OCIs] *as early in the acquisition process as possible*."  48 C.F.R. § 9.504(a)

---

[19] Regarding the merits of E&Y's November 30, 2017 Amended Complaint, the court does not address Counts I-V in order.  Instead, the court's analysis begins with Count III, because it is relevant to each of the remaining Counts.  Next, Counts II and IV are discussed, because the court reads these Counts to allege violations of the same FAR provision.  Then, the court analyzes Count I, as it also encompasses elements of the court's discussion of Counts II-IV.  Finally, the court analyzes Count V.

(emphasis added); *see also PAI Corp.*, 614 F.3d at 1352; *Jacobs Tech.*, 100 Fed. Cl. at 210.  If a potential or actual OCI is identified, the contracting officer must determine if it is "significant." 48 C.F.R. § 9.504(a); *see also Jacobs Tech.*, 100 Fed. Cl. at 210.  "A significant . . . [OCI] is one which provides the bidding party a *substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders*."  *PAI Corp.*, 614 F.3d at 1352 (emphasis added).  "If the contracting officer decides that a particular acquisition involves a significant potential [OCI]," the contracting officer must document the analysis and submit a recommendation for corrective action to the head of the contracting agency. *See* 48 C.F.R. § 9.506(b); *see also Jacobs Tech.*, 100 Fed. Cl. at 210–11 ("The head of the contracting agency will determine the appropriate action[,] based on the contracting officer's recommendation, FAR 9.506(c), and may decide to disqualify a government contractor[,] if significant OCIs cannot be mitigated[.]").

On or about May 17, 2017, the CO was informed that PwC would "likely bid" on the MAHSO Solicitation.  Tab 27, AR 831.  At that time, the CO knew that the VA had provided "proprietary" non-public government information, *i.e.*, the Pilot Study Data, "directly" to Craddock and PwC for use in developing the Methodology.  Tab 27, AR 831, 835; *see also* Tab 27, AR 906 (PwC confirming that "much of [the information used during the Pilot Study] was generated by the [VA]").  Initially, however, neither the Pilot Study Data nor the Methodology were provided to the other prospective offerors, including E&Y.  Tab 9, AR 337.  Although several offerors subsequently requested the Methodology (Tab 8, AR 298–300, 302), the CO refused, stating that it would "be provided after award of the BPA."  Tab 8, AR 298.  Seven days before proposals were due, however, the CO changed course and provided the Methodology to all prospective offerors "to minimize any OCI concerns[.]"  Tab 27, AR 833.  But, the underlying Pilot Study Data was never provided.  Tab 27, AR 833.  That decision by the VA created a "significant" unequal access to information OCI.  And, although the CO admitted that the Pilot Study Data may have provided PwC with a "minor competitive advantage," the CO minimized this advantage by describing the Pilot Study Data as "unique" only to the three Pilot Study Market Areas, and concluded that the Pilot Study Data would not "benefit [PwC] in providing a quote for the resulting solicitation as each market is independent."  Tab 27, AR 833.  The Administrative Record, however, evidences the contrary.

As the CO admitted, the Methodology included only "*general*" or "*high level*" information (Tab 27, AR 833, 835 (emphasis added)) and would "require extensive input/customization" from the successful offeror.  Tab 8, AR 299.  In contrast, the Pilot Study Data was "very robust."  Tab 27, AR 978 (explaining that PwC was "oriented to data conventions, data workbooks, automated data tools and several very robust data sets"); *see also* Tab 27, AR 979–81 ("Data Distribution Example").  Although it may be true that the Pilot Study Data consisted of information about only the three Pilot Study Market Areas (Tab 27, AR 833, 979–81 ("Data Distribution Example")), this "robust" information, contained "proprietary" non-public government information that was provided by the VA to Craddock and PwC, and then used to develop the Methodology, *i.e.*, the "general approach for analyzing *each [VHA] market [area]*."  Tab 27, AR 833 (emphasis added); *see also* Tab 27, AR 831, 835 (describing the Methodology, as a "step-by-step process that outline[d] the high level approach, activities, and data that [would] be used for *each [VHA] market [area]*" (emphasis added)).  The competitive advantage to PwC in having access to the Pilot Study Data prior to submitting its proposal was that the VA provided PwC with access to "proprietary" non-public government information that was necessarily representative of every VHA market area.

Tab 9, AR 351 (The "[M]ethodology consist[s] of proven analytical tools and applications to assess access, quality, and cost of available community care, conduct market assessments *for all V[H]A markets across the nation.*" (emphasis added)).

The competitive significance of the Pilot Study Data is further evidenced by the fact that *every* other offeror made "staffing level" assumptions that were ██████████ to PwC's, *i.e.*, PwC's proposed "staffing level" was ████████████████████ than that of the other offerors.[20] Tab 11, AR 519; Tab 18, AR 737.  In fact, the "staffing level" assumptions by Deloitte, E&Y, Huron, and McKinsey were determined by the SSEB and the CO to be mistaken, thereby contributing to all of the aforementioned offerors being not eligible for an award.  Tab 27, AR 737. In contrast, the CO touted that PwC was able to properly estimate the "level of effort . . . to perform the tasks identified in . . . [Task Order One.]"  Tab 27, AR 835.  But, the fact that every offeror, except PwC, made identical "mistaken" "staffing level" assumptions, evidences a significant unequal access to information OCI attributable to PwC's access to the Pilot Study Data.  The CO even admitted that PwC's access to the Pilot Study Data may have provided PwC with a better understanding of the MAHSO Project's technical requirements, including "staffing level."  Tab 27, AR 833 ("The developed evaluation factors listed in the [MAHSO S]olicitation and used during the source selection process were general in nature and not unique regarding the pilot contract *other than the technical evaluation criteria that discussed understanding methods of approach and how to staff those methods.*" (emphasis added)).  The CO, however, attributed PwC's better understanding of the appropriate "staffing level" primarily to PwC's experience as an "incumbent contractor."  Tab 27, AR 837.  But, PwC explained that any "incumbent advantage . . . from working on the [Pilot Study], . . . was neutralized/mitigated through the [VA]'s sharing of the [M]ethodology."  Tab 27, AR 906.  This statement refutes the CO's conclusion and supports the fact that something more than mere incumbency, *i.e.*, the Pilot Study Data, was the source of PwC's better understanding.

The United States Court of Appeals for the Federal Circuit has held that "[t]he *mere existence of a prior or current contractual relationship* between a contracting agency and a firm does not create an unfair competitive advantage, and an agency is not required to compensate for every competitive advantage gleaned by a potential offeror's prior performance of a particular requirement."  *PAI Corp.*, 614 F.3d at 1353 (emphasis added).  But, in that case, the protestor "*failed to introduce any evidence* before the trial court showing . . . a substantial and unfair competitive advantage through unequal access to information."  *Id*. (emphasis added).  Therefore, the protestor's "*bare allegation* [of] . . . a prior contractual relationship . . . [was] insufficient to show a significant potential conflict."  *Id*. (emphasis added).  In this case, however, the Administrative Record evidences more than E&Y's "bare allegation[s of] . . . a prior contractual relationship;" instead, it reflects that PwC had access to "proprietary" non-public government information, not available to the other prospective offerors, that gave PwC a "substantial and unfair competitive advantage during the procurement process."  *Id.* at 1352.

---

[20] Deloitte, E&Y, Huron, and McKinsey proposed ██ VISN teams of ██ members each, or ██ VISN staff members; in contrast, PwC proposed ██ VISN teams of ██ members each, or ██ VISN staff members.  Tab 11, AR 519; Tab 18, AR 737.

On October 9, 2017, the CO sent "an email . . . to PwC referencing several questions concerning [PwC's] . . . involvement with [the Pilot Study.]"  Tab 27, AR 836; *see also* Tab 27, AR 905–10.  Therein, the CO offered "PwC the opportunity to explain why they did or did not enjoy a competitive advantage by working . . . to develop the Methodology."  Tab 27, AR 836. PwC responded that, "[t]hrough the provision of the . . . [M]ethodology, all [prospective offerors] were privy to the *same information* PwC . . . w[as] prior to proposal submission."  Tab 27, AR 906 (emphasis added).  PwC, however, did not address the Pilot Study Data.  Tab 27, AR 833.  Not surprisingly, the CO agreed with PwC and concluded that "any . . . information gathered during the [Pilot Study] . . . was included in the [M]ethodology . . . , [thereby] eliminating any OCI concerns."  Tab 27, AR 836.  The court, however, does not view this type of *post hoc* rationalization to be either relevant or persuasive.  *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971) ("The lower courts based their review on the litigation affidavits that were presented.  These affidavits were merely '*post hoc*' rationalizations, which have traditionally been found to be an inadequate basis for review." (internal citations omitted)); *see also Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 508 (Fed. Cl. 2003) ("The Supreme Court has made clear that *post hoc* rationalizations offered by the agency should be afforded limited importance in the court's analysis.").

Rather the Administrative Record evidences that, the CO failed to "identify and evaluate" PwC's access to the Pilot Study Data as a "significant" unequal access to information OCI prior to awarding the MAHSO Contract.  Tab 27, AR 833.  The Administrative Record also evidences that the CO failed to document or provide any analysis or submit any recommendations to his VA superiors to mitigate this OCI.  Consequently, no effort was made to mitigate PwC's exclusive access to "proprietary" non-public government information, *i.e.*, the Pilot Study Data, prior to awarding the MAHSO Contract.  In sum, the CO failed to adequately "analyze [the] planned acquisition[,]" *i.e.*, the MAHSO procurement, "in order to . . . [i]dentify and evaluate potential [OCIs] *as early in the acquisition process as possible*," and "[a]void, neutralize, or mitigate significant potential [OCIs] *before contract award*."  48 C.F.R. § 9.504(a) (emphasis added).

For these reasons, the court has determined that PwC had a "significant" unequal access to information OCI and the CO's failure to identify, document, and mitigate this OCI prior to awarding the MAHSO Contract violated FAR 9.504(a).  *See* 48 C.F.R. § 9.504(a)(2); *see also Turner Const. Co., Inc. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) ("If . . . the [contracting officer's] post-award evaluation shows that a significant potential OCI did exist and went unmitigated in violation of [FAR] 9.504(a)(2), then serious remedial actions are appropriate.).

### c.      A Biased Ground Rules Organizational Conflict Of Interest, However, Did Not Exist.

Count III of E&Y's November 30, 2017 Amended Complaint alleges that PwC's "work in developing the [M]ethodology meant that it drafted a key aspect of the [SOW].  Thus, PwC had . . . [a] biased ground rules OCI[]."  Am. Compl. ¶ 114; *see also* Pl. Br. at 46.

A "biased ground rules" OCI "may occur in situations where an offeror, as part of [prior] performance of a government contract, has provided input to the statement of work or specifications of a [solicitation] in such a way as to provide the firm a competitive advantage in

responding to the [solicitation]." *Jacobs Tech.*, 100 Fed. Cl. at 210 (citing *Turner Constr.*, 94 Fed. Cl. at 569).

FAR 9.505-2(b)(1)[21] provides that "[i]f a contractor prepares, or assists in preparing, a work statement to be used in competitively acquiring . . . services—or provides material leading directly, predictably, and without delay to such a work statement—that contractor may not supply . . . the services." 48 C.F.R. § 9.505-2(b)(1); *see also Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 773 (Fed. Cl. 2006) ("The ['biased ground rules'] group consists of situations in which a firm, as part of its performance of a government contract, has in some sense set the ground rules for another government contract by, for example, writing the statement of work *or the specifications*.  In these 'biased ground rules' cases, *the primary concern is that the firm could skew the competition, whether intentionally or not, in favor of itself*." (emphasis added)).

FAR 9.505-2(b)(1)(ii),[22] however, "excepts certain government contractors from the prohibitions of FAR 9.505-2(b)(1)—specifically, contractors who have participated in the development and design work of the contract under which the work statement was drafted." *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 54 (D.D.C. 2005). The text of FAR 9.505-2(b)(1)(ii) "plainly contemplates the situation where a firm wishes to compete for a contract for . . . services based on that firm's earlier development and design work." *Id.* at 54.  The rationale underlying FAR 9.505-2(b)(1)(ii)'s exception is set forth in FAR 9.505-2(a)(3):

> In development work, it is normal to select firms that have done the most advanced work in the field.  These firms can be expected to design and develop around their own prior knowledge.  Development contractors can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the [g]overnment.  In many instances the [g]overnment may have financed the development.  Thus, while the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair; hence no prohibition should be imposed.

48 C.F.R. § 9.505-2(a)(3).  As such, "the competitive advantages afforded the contractor in such situations are not prohibited as unfair[,] because they are both unavoidable and advantageous to the government." *Ervin & Assocs., Inc.*, 370 F. Supp. 2d at 55.

---

[21] E&Y's citation to FAR 9.505-1 as governing biased ground rules OCIs is in error, as that provision concerns "systems engineering and technical direction," neither of which are relevant to PwC's work on the Pilot Study.  *See* 48 C.F.R. § 9.505-1.

[22] FAR 9.505-2(b)(1)(ii) excludes contractors that have "participated in the development and design work" from the prohibitions of FAR 9.505-2(b)(1)).  48 C.F.R. § 9.505-2(b)(1)(ii); *see also* 48 C.F.R. § 9.505-2(b)(3) ("For the reasons given in 9.505-2(a)(3), no prohibitions are imposed on development and design contractors.").

In this case, the Administrative Record reflects that PwC served as a development and design contractor for the MAHSO Project. Under the Pilot Study Contract, Craddock and PwC were required to "[d]efine the ideal healthcare delivery system design processes and outputs." Tab 27, AR 934. In doing so, Craddock and PwC were "to evaluate feasibility, time, costs, adverse events, strengths, and weakness of the proposed [MAHSO Project] to improve upon the study design." Tab 1, AR 5. In short, they advised the VA how best to "establish high performing health care networks for VHA services and facilities." Tab 1, AR 4. After months of "extensive market analysis activities," Craddock and PwC developed an "ideal" method, *i.e.*, the Methodology, and provided it to the VA for use during performance of the MAHSO Project. Tab 27, AR 830–31, 934. Accordingly, PwC's work on the Pilot Study was "development and design work" under FAR 9.505-2(b)(1)(ii).

In addition, PwC was not directly involved in drafting the MAHSO Solicitation. Tab 27, AR 831, 834. And, although the Solicitation required offerors to comply with the Methodology (Tab 9, AR 339, 341–42), because the Methodology is "generic" in nature, it does not present the "primary concern" underlying biased ground rules OCIs, *i.e.*, that PwC could skew the competition in favor of itself. *See Sys. Made Simple, Inc.*, B-412948.2, 2016 WL 4158119 (Comp. Gen. July 20, 2016) (explaining that a contractor "did not have the ability to shape the playing field of later procurements on behalf of [itself], because [the contractor] had prepared a generic assessment"). Instead, the Methodology describes only a "general approach for analyzing each [VHA] market [area]." Tab 27, AR 833. The Methodology does not require the use of proprietary products or services and the Administrative Record does not reflect that the Methodology was written such that only PwC could comply with the requirements.

For these reasons, the court has determined that, because PwC's work on the Pilot Study was "development and design work," and since the VA drafted the MAHSO Solicitation without direct involvement from PwC, the VA did not violate FAR 9.505-2(b)(1).

### d. The Source Selection Evaluation Board Violated FAR 8.405-3(b)(2), By Failing To Evaluate Proposals, Pursuant To The Requirements Of The Solicitation.

FAR 8.405-3(b)(2) provides, when "establish[ing] . . . a BPA . . . [t]he . . . contracting officer shall ensure all quotes received are fairly considered and award is made in accordance with the basis for selection in the [solicitation]." 48 C.F.R. § 8.405-3(b)(2)(vi) (emphasis added); *see also Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 430 (Fed. Cl. 2010) ("[A]n agency shall evaluate proposals and assess their qualities solely based on the factors and subfactors specified in the solicitation."); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (Fed. Cl. 2009) ("It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation."); *Hunt Building Co., Ltd. v. United States*, 61 Fed. Cl. 243, 273 (Fed. Cl. 2004) (An "agency's failure to follow its own selection process embodied in the [s]olicitation is . . . a prejudicial violation of a procurement procedure established for the benefit of offerors.").

### i. As To Ernst & Young, LLP's Technical Proposal.

Count II of E&Y's November 30, 2017 Amended Complaint alleges that the VA's "deci[s]ion to issue the award to PwC involved [the] application of . . . unstated evaluation

45

criteri[a]." Am. Compl. ¶¶ 95–105. Specifically, the Solicitation's SOWs required VISN teams of five members. Am. Compl. ¶ 102. The SSEB, however, assigned E&Y a weakness for ██ ███████████████████. Am. Compl. ¶ 102. The Amended Complaint also alleges that, despite complying with the requirements of the Solicitation, the SSEB improperly assigned weaknesses to E&Y, █████████████████████████████████████." Am. Compl. ¶¶ 98– 105. The court reads Count II as challenging the SSEB's evaluation of E&Y's technical proposal as a violation of FAR 8.405-3(b)(2), for failing to evaluate E&Y's proposal, pursuant to the requirements of the MAHSO Solicitation.

The Task Order One SOW required that the successful offeror develop Phase I of the National Realignment Strategy for 32 VHA market areas across six VISNs. Tab 9, AR 339. In turn, the Solicitation stated that the VA would evaluate the feasibility of each offeror's technical approach, by considering the "labor mix," "management," and "staffing level." Tab 8, AR 272 ("Additionally, . . . the evaluation will consider the level o[f] effort and mix of labor proposed to perform the tasks identified in [Task Order One]."); Tab 8, AR 282 (explaining that offerors were to propose a "staffing/management plan tailored to [Task Order One]").

Regarding the "labor mix," the Task Order One SOW provided only that "[t]eams shall be supported by . . . disciplines and specialists[,] as needed." Tab 9, AR 344. It did not, however, provide any other information about the composition of the "labor mix." Tab 9, AR 344. The Task Order One SOW also required that "[c]ore team leads include a Senior Medical Facility Planner (Architect) and a Senior Medical Services Planner (Healthcare Planner)." Tab 9, AR 344. But, it did not indicate whether each VISN team was to be led by an Architect, a Healthcare Planner, or both. Tab 9, AR 344. In the absence of a definition or more specific information, the SSEB was afforded substantial latitude in its evaluation of E&Y's proposed "labor mix" and "team leads." *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (explaining that "a court will not second guess . . . discretionary determinations of procurement officials); *see also* ST Net, Inc. v. United States, 112 Fed. Cl. 99, 108 (Fed. Cl. 2013) ("This deferential standard reflects the substantial latitude afforded to agency officials to determine which proposal represents the best value for the government." (internal quotations omitted)).

In contrast, as to "staffing level," the Task Order One SOW required each offeror to "have one team per VISN," or six VISN teams. Tab 9, AR 339; *see also* Tab 9, AR 344 ("The number of teams shall be determined by the number of Markets and VAMCs."). In addition, as a "General Requirement," the Task Order One SOW stated that "[t]ravel is required for at least six teams of five healthcare planners and data analysts to assess . . . [market areas] within each of the six (6) VISNs[.]" Tab 9, AR 344 (emphasis added). Therefore, the Task Order One SOW specified the minimum "staffing level" requirement, *i.e.*, "at least" six VISN teams of five members each[23] (Tab

---

[23] Although the Government argues that the qualifier "at least" modifies the phrase "five health care planners and data analysts," this is inconsistent with the plain meaning of the Task Order One SOW. *Cf. Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning."). The Task Order One SOW states that there should be "at least *six* [VISN] teams" with "*five* healthcare planners and data analysts" each. If the VA intended to construe the Task Order

9, AR 339, 344), and the SSEB was required to evaluate proposals in accordance with this requirement. *See* 48 C.F.R. § 8.405-3(b)(2)(vi).

Although Deloitte's, E&Y's, Huron's, and McKinsey's proposals complied with the Task Order One SOW's minimum "staffing level" requirement, they were assessed weaknesses by the SSEB, because of "████████████████████████" Tab 18, AR 699, 701, 704, 706 (emphasis added). Regarding E&Y's proposal in particular, the SSEB stated that, "██████████████████████████████████████████████████████████████████████████ ████████." Tab 18, AR 700 (emphasis added). In contrast, PwC's proposal of ██████-member VISN teams was lauded by the CO as "superb" and touted by the SSEB as "demonstrat[ing] a thorough understanding of the complexity and size of the task at hand." Tab 18, AR 707, 737. PwC's proposed "staffing level," however, was almost ██████████ that required by the Task Order One SOW. Tab 9, AR 339, 344. Although the SSEB's positive evaluation of PwC's proposed "staffing level" was not inconsistent with the Solicitation, the SSEB's assignment of a weakness for E&Y's proposed "staffing level" was, because E&Y's proposed "staffing level" ██████ ██████████████████████████████████████████████. Accordingly, the SSEB did not "fairly consider" E&Y's technical proposal "in accordance with the basis for selection in the [Solicitation]." *See* 48 C.F.R. § 8.405-3(b)(2)(vi).

For these reasons, the court has determined that the SSEB's evaluation of E&Y's technical proposal violated FAR 8.405-3(b)(2)(vi). *See* 48 C.F.R. § 8.405-3(b)(2)(vi).

### ii.   As To PricewaterhouseCoopers Public Sector, LLP's Past Performance Examples.

Count IV of E&Y's November 30, 2017 Amended Complaint alleges that the SSEB's evaluation of PwC's proposal was "unreasonable." Am. Compl. ¶¶ 118–27. Specifically, the SSEB "unreasonably credited PwC with the . . . [p]ast [p]erformance of its affiliate [████ ████████]" and improperly "assign[ed] PwC a strong evaluation rating despite that PwC lacks experience providing federal health market assessments." Am. Compl. ¶¶ 120, 123. The court reads these portions of Count IV as challenging the SSEB's evaluation of PwC's past performance examples as a violation of FAR 8.405-3(b)(2), for failing to evaluate E&Y's proposal, pursuant to the requirements of the MAHSO Solicitation.

The Solicitation allowed offerors to submit "a narrative detailing up to three (3) contracts (prime contracts, task/delivery orders, and/or major subcontracts) in performance during the past three (3) years from the date of issuance of the . . . [S]olicitation, which are relevant to the efforts required by the [Solicitation]." Tab 8, AR 284. In evaluating each offeror's past performance, the SSEB was to "assess the relative risks associated with a quoter's likelihood of success in fulfilling the [S]olicitation's requirements as indicated by that quoter's record of past performance." Tab 8, AR 274. The Solicitation stated, however, that "[i]n this context, 'quoter' refers to the *prime*

---

One SOW as the Government suggests, it would have required: "six teams of at least five healthcare planners and data analysts."

*[c]ontractor and all proposed major subcontractor(s)*." Tab 8, AR 274 (emphasis added). Each offeror was responsible for "identify[ing] their major subcontractors." Tab 8, AR 303.

On PwC's "Standard Form (SF 1449)," PwC identified "PricewaterhouseCoopers Public Sector LLP," *i.e.*, PwC, as the "prime contractor." Tab 11, AR 584; *see also* Tab 11, AR 571 (PwC identifying the "[p]rime" contractor to be associated with CAGE Code 783T6 and DUNS Number 079529872); Tab 2, AR 53 (associating "PricewaterhouseCoopers Public Sector LLP" with CAGE Code 783T6 and DUNS Number 079529872). PwC also identified ██████████, and ██████████ as "[m]ajor subcontractors." Tab 11, AR 571. PwC, however, did not list ██████████ as a "major subcontractor." Tab 11, AR 571. Therefore, pursuant to the terms of the Solicitation, the VA could consider past performance examples of PwC, as the "prime contractor," and ██████████, and ████, as PwC's "major subcontractors." The VA, however, could not consider past performance examples of ████.

PwC submitted three examples of past performance: ██████████; and ██████████. Tab 11, AR 564–66. Each of these projects, however, was performed by ██████████, not PwC or the "major subcontractors" identified in PwC's proposal.[24] Tab 11, AR 564–66. Nevertheless, the SSEB credited PwC with "past performance" for each of these projects. Tab 18, AR 721–22. And, the SSEB concluded that, based on the projects, PwC "[d]emonstrated past performance to meet[] the needs of the BPA and experience in area's relevant to the [SOW]" and rated PwC as "Low Risk." Tab 18, AR 721–22. The CO also determined that "PwC's past performance was relevant with high quality, and resulted in low past performance risk." Tab 18, AR 738. The SSEB's consideration of ██████████ projects, however, was contrary to the Solicitation's instructions, because ████ was neither the "prime contractor" nor one of PwC's "major subcontractors." Accordingly, the SSEB did not "fairly consider" PwC's past performance examples "in accordance with the basis for selection in the [Solicitation]." *See* 48 C.F.R. § 8.405-3(b)(2)(vi).

PwC's proposal, however, stated that

PwC will . . . draw on the staff and expertise of its teaming partners and the experience, resources, and capabilities of its affiliate, . . . ██████████[.] Both

---

[24] E&Y argues that the same is true for at least some of PwC's "Corporate Experience Examples." Pl. Br. at 36 ("Similarly, the Corporate Experience examples offered in PwC's proposal include ██████████ clients of ██████████, not PwC[.]"). It is unclear from the Administrative Record, however, which entity performed these projects, because PwC's proposal does not include any information other than PwC's representations. Tab 11, AR 553–59. Therefore, it is not clear how the VA was able to verify that PwC's "Corporate Experience Examples" were performed by PwC or its "major subcontractors," as required by the Solicitation. Tab 8, AR 273; *see also* Tab 19, AR 739 (admitting that the "[Past Performance Information Retrieval System] was not reviewed because none of the previous federal contracts were reported to [Contractor Performance Assessment Reporting System]").

> PwC and ████████ . . . *are partners in their common parent [PwC US]* . . . and report ultimately to PwC US management. ████████ resources will be directly and meaningfully involved in this effort.

Tab 11, AR 519 (emphasis added).

The Government and PwC argue that this discussion was sufficient to satisfy the MAHSO Solicitation, citing *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137 (Fed. Cl. 2014), and *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704 (Fed. Cl. 2008). Gov't Br. at 32–33; Int. Br. at 30–34. Reliance on these non-precedential opinions, however, is misplaced.

In this case, the Solicitation defined "quoter" as: "the prime [c]ontractor and all proposed major subcontractor(s)." Tab 8, AR 274. In addition, the CO instructed prospective offerors that, "[i]t [was] up to [each offeror] to identify their major subcontractors." Tab 8, AR 303. In *Am. Auto Logistics* and *Femme Comp*, the court determined that "there is no requirement that an offeror must designate its affiliated corporations as subcontractors." *Am. Auto Logistics*, 117 Fed. Cl. at 188; *Femme Comp*, 83 Fed. Cl. at 747. In both cases, however, the court relied on FAR 15.305(a)(2)(iii), which provides that "[t]he evaluation *should* take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition." 48 C.F.R. § 15.305(a)(2)(iii) (emphasis added). FAR 15.305(a)(2)(iii), however, does not mandate consideration of an offeror's past performance; instead, it suggests that such information *should* be considered, not that it "must" or "shall." *See Res Rei Dev., Inc. v. United States*, 126 Fed. Cl. 535, 555–56 (Fed. Cl. 2016) (explaining that the court has consistently interpreted FAR 15.305(a)(2)(iii) "as permissive, giving an agency discretion to decide whether to consider such information"). In this case, the VA required that each offeror identify "major subcontractors" and specified that only past performance of the "prime contractor" and "major subcontractors" would be considered.[25] As such, the text of the Solicitation governs how the proposals are to be evaluated.

For these reasons, the court has determined that the SSEB's evaluation of PwC's past performance examples violated FAR 8.405-3(b)(2)(vi). *See* 48 C.F.R. § 8.405-3(b)(2)(vi).

---

[25] In *Am. Auto Logistics* and *PricewaterhouseCoopers* the "affiliates" were required to work with the "prime contractor" through agreements. *See Am. Auto Logistics*, 117 Fed. Cl. at 187 (explaining that the two companies "had entered into a teaming agreement"); *see also PricewaterhouseCoopers*, 126 Fed. Cl. at 353 ("Protestor argues that 'there should be no doubt that PwC was utilizing the resources of its parent' because the task order was being issued against a . . . contract that had previously been novated from the parent entity, PwC US, to PwC Public Sector. Protestor argues that the 'transfer of resources and assets from the parent to PwC is the bedrock of a novation, which is why these resources of PwC US were appropriate[ly] evaluated by DHA.'" (internal alterations omitted)). In this case, however, ████████ had no contractual duty to assist PwC; instead, the two companies were simply described as "partners in their common parent [PwC US]." Tab 11, AR 519.

> **e.    The Contracting Officer Violated FAR 1.102-2(c)(3), By Failing To Conduct Discussions Prior To Award Of The Market Area Health System Optimization Contract.**

Count I of E&Y's November 30, 2017 Amended Complaint alleges that the CO's evaluation of E&Y's proposal was "arbitrary, capricious, and lacked reason." Am. Compl. ¶¶ 75–94. Specifically, the CO "failed to conduct discussions with E[&]Y despite that the [Solicitation] clearly confused the offerors." Am. Compl. ¶ 92.

"[U]nder FAR Part 8, [an agency is] under no obligation to hold discussions." *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 15 (Fed. Cl. 2012). And, "it is clear that . . . a contracting agency retains discretion in determining whether or not to hold discussions in a particular procurement." *Day & Zimmermann Servs.*, 38 Fed. Cl. at 604. The decision whether to conduct discussions, however, cannot be "arbitrary, capricious, [or] an abuse of discretion." *See Banknote*, 365 F.3d at 1350. In addition, the court must ensure that a procuring agency's actions "comply with [the] FAR's requirement of fundamental fairness in the procurement process." *Distributed Sols.*, 106 Fed. Cl. at 16 n.9 ("Although FAR Part 15 does not apply, the Court will review [the agency's] actions to ensure they comply with FAR's requirement of fundamental fairness in the procurement process."). This requires that "[a]ll contractors and prospective contractors . . . be treated fairly and impartially[.]" 48 C.F.R. § 1.102-2(c)(3).[26] Therefore, an agency's discretion in deciding whether to conduct discussions is "not unfettered." *Day & Zimmermann Servs.*, 38 Fed. Cl. at 604.

Although the Solicitation notified offerors of the VA's intent to award the MAHSO Contract without discussions, it also "reserve[d] the [VA's] right to communicate with any or all [c]ontractors submitting a quote, if it [was] determined advantageous to the [VA] to do so." Tab 8, AR 269. Explaining the decision not to conduct discussions, the CO stated:

> The [VA] provided in the solicitation that it "intends to establish a BPA and award [Task Order One] without further communicating with [c]ontractors." Based on the evaluations of each quote against all evaluation criteria, the [CO] has determined that award can be made on the basis of the initial quotes to PwC and that it is in the best interest of the [VA] to do so. Although, four of the five quoters presented problems within their technical [proposals] and [Task Order One] pricing quotes that raised concerns, it was determined by the [CO] that discussions *would only allow the unsuccessful quoters to better their technical quotes and pricing to become more competitive with PwC and not actually provide any real benefit to the [VA]*. Several quoters provided ███████████████████████████ ███████ based on the scope and methodology provided. *Enough detailed information was provided to the quoters* throughout the solicitation for them to understand the importance of staffing and the level of

---

[26] FAR 1.102-2(c)(3) provides that, "[t]he [g]overnment shall exercise discretion, use sound business judgment, and comply with applicable laws and regulations in dealing with contractors and prospective contractors. All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same." 48 C.F.R. § 1.102-2(c)(3).

> effort/methodology needed to accomplish the stated tasks and *it would be unfair to PwC for properly following the [S]olicitation['s] requirements, by opening discussions and allowing quoters a second chance*.  In addition, since every quoter other than PwC received a less than satisfactory rating for corporate experience, they would not have been eligible for award if discussions for technical and price were opened.

Tab 18, AR 737.

The CO's reasoning, however, is problematic for several reasons.  First, the CO's decision not to conduct discussions was based on several mistaken conclusions.  For example, the CO found that "[e]nough detailed information was provided to the quoters throughout the [S]olicitation for them to understand the importance of staffing and the level of effort/methodology needed to accomplish the stated tasks."  Tab 18, AR 737.  As previously discussed, however, there was a significant unequal access to information OCI.  The CO also mistakenly concluded that Deloitte, E&Y, Huron, and McKinsey were not eligible for an award based, in part, on the SSEB's evaluation of their technical proposals.  As previously discussed, however, the SSEB's technical evaluation violated FAR 8.405-3(b)(2)(vi), as it was not consistent with the requirements outlined in the MAHSO Solicitation.

Second, the Solicitation required the CO to use "the best value trade-off process to select . . . the most beneficial quote, price and other factors considered."  Tab 8, AR 269.  The nature of the "trade-off process" allowed the VA to award a contract to an offeror that proposes a higher price than other offerors, if the technical benefits offset the additional cost.  *See* 48 C.F.R. § 15.101-1(c) ("Th[e trade-off] process permits trade[-]offs among cost or price and non-cost factors and allows the [g]overnment to accept other than the lowest priced proposal.  The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for trade[-]offs must be documented[.]").  And, the "primary objective of discussions is to maximize the [g]overnment's ability to obtain [the] best value[.]"  48 C.F.R. § 15.306(d)(2).  In this case, the CO determined that conducting discussions "would only allow the unsuccessful quoters to *better their technical quotes and pricing* to become more competitive with PwC and not actually provide any real benefit to the [VA]."  Tab 18, AR 737 (emphasis added).  These benefits, *i.e.*, "better . . . technical quotes and pricing," however, are the exact benefits to be obtained by the trade-off process.

Third, the need to conduct discussions in this case became apparent early in the evaluation process, because every offeror, except PwC, made identical "mistaken" assumptions regarding "staffing level" and "level of effort."  Tab 11, AR 519; Tab 18, AR 737.  To a reasonable contracting officer, this should have suggested a problem with the Solicitation, the evaluation process, or both.  Discussions would have afforded the CO an opportunity to clarify the Solicitation's requirements and correct mistaken assumptions; possibly leading to more technically beneficial proposals.  The advantage of conducting discussions is also evidenced by the fact that PwC's proposed price of $11,981,646.00 for Task Order One was ▮▮▮ more than the next highest price of $▮▮▮▮▮▮.  Tab 18, AR 736.  Given this significant discrepancy, discussions would have benefitted the VA.  *See Lockheed Martin Info. Sys.*, B-292836 *et al.*, 2003 WL 23104713 (Comp. Gen. Dec. 18, 2003) (directing the agency to "engage in discussions [and] obtain revised proposals" where the agency had evaluated proposals inconsistently); *see also* 48 C.F.R. §

15.306(d) ("[Discussions] are exchanges, in either a competitive or sole source environment, between the [g]overnment and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These [discussions] may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract.").

Finally, the CO's justification for not conducting discussions, because doing so "would be unfair to PwC," certainly does not evidence fair and equal treatment. Tab 18, AR 737. FAR 1.102-2(c)(3) requires that *all* prospective offerors be treated fairly. *See* 48 C.F.R. § 1.102-2(c)(3). The CO's concern only for PwC conflicts with FAR 1.102-2(c)(3), as well as the purpose of the "trade-off process," which is to determine the "best value" for the agency.

For these reasons, the court has determined that the CO's decision not to conduct discussions under the circumstances in this case, violated FAR 1.102-2(c)(3)'s requirement that "[a]ll contractors and prospective contractors shall be treated fairly and impartially." 48 C.F.R. § 1.102-2(c)(3).

### f.   The Administrative Record Does Not Evidence That The Contracting Officer's Decision Not To Award The Market Area Health System Optimization Contract To Ernst & Young, LLP Was Arbitrary And Capricious, Or Lacked A Rational Basis.

Count V of E&Y's November 30, 2017 Amended Complaint alleges that the CO's "best value trade-off" determination was "arbitrary, capricious, and lack[ed] a rational basis." Am. Compl. ¶¶ 128–132. Specifically, the Amended Complaint alleges that, but for, the SSEB's "arbitrary and capricious evaluation, E[&]Y would have received the contract award." Am. Compl. ¶ 132.

Although the SSEB's evaluation of E&Y's and PwC's proposals violated FAR 8.405-3(b)(2)(vi), the Administrative Record does not reflect that E&Y would have been awarded the MAHSO Contract, but for these violations. This is because, even if PwC were to be excluded from submitting a proposal, the remaining offerors, Deloitte, E&Y, Huron, and McKinsey, each received identical ratings from the SSEB. Tab 18, AR 736. In addition, the CO did not differentiate between the proposals from these offerors, because each was determined not be eligible for an award, based on the SSEB's evaluation. As such, there is no indication from the SSEB or the CO as to which offeror's proposal was viewed as the next best after PwC's proposal. *See Cyios Corp.*, 122 Fed. Cl. at 735 (finding that, because "the agency did not rank the . . . unsuccessful offerors" and "did not compare the unsuccessful offerors to each other . . . there [was] no offeror in th[e] procurement clearly identified as next in line").

For these reasons, the court has determined that the Administrative Record does not evidence that the CO's decision not to award the MAHSO Contract to E&Y was arbitrary and capricious or lacked a rational basis.

g.      **Ernst & Young, LLP Was Prejudiced By The Contracting Officer's And The Source Selection Evaluation Board's FAR Violations.**

Finally, the court must determine whether E&Y was prejudiced by the FAR violations addressed herein. *See Bannum*, 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid [protestor] was prejudiced by that conduct.").

At the outset of this procurement, the SSEB found E&Y to be "responsive and included in the competition." Tab 18, AR 678.  In this case, however, violations of FAR 1.102-2(c)(3), 8.405-3(b)(2)(vi), and 9.504(a), individually and collectively, prejudiced E&Y, and were the cause, in part, of E&Y being determined not to be eligible for an award.  Tab 18, AR 737; *compare Allied Tech. Grp.. Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011).  If the VA decides to reissue the MAHSO Solicitation, E&Y will be in a position to revise its proposal and will have a "greater than insubstantial chance of securing the [MAHSO C]ontract." *See Info. Tech. & Applications Corp.*, 316 F.3d at 1319.  Accordingly, E&Y has demonstrated prejudice. *See Bannum*, 404 F.3d at 1353.

h.      **Ernst & Young, LLP Is Entitled To Injunctive Relief.**

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also* 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (3d ed. 2004) ("a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion").  The movant bears the burden of persuasion, when requesting that the court grant an injunction. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

To determine whether an injunction is warranted, the court must consider whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037; *see also FMC Corp.*, 3 F.3d at 427 ("No one factor, taken individually, is necessarily dispositive . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of others."); *see also* RCFC 65(a).

Based on a review of the Administrative Record as discussed herein, the court has determined that E&Y has established success on the substantive merits as to Counts I, II, IV, and, in part, III of the November 30, 2017 Amended Complaint.

As to irreparable harm, a movant that establishes likelihood of success on the merits receives the benefit of a presumption of irreparable harm. *See Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("We recognize, of course, that a movant who clearly establishes the first factor receives the benefit of a presumption on the second.").  In addition, without an injunction, an award of the BPA at issue will preclude E&Y and other offerors from an opportunity to compete fairly. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (Fed. Cl.

2003) ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm[.]").  Although the court cannot determine from the Administrative Record whether E&Y is entitled to be awarded the MAHSO Contract, E&Y certainly is entitled to demonstrate the competitive benefits of its proposal on a level playing field.  *See Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (Fed. Cl. 2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders.").  Accordingly, E&Y has established that it would be irreparably harmed, if an injunction was not issued.

As to the balance of hardships, the court has determined that the harm to E&Y outweighs the harm to the VA.  The FAR violations identified herein have deprived E&Y of an opportunity to compete in a fair and impartial procurement process and improperly prejudiced E&Y's economic interests.  Although the VA may suffer an administrative burden, in the event it decides to reissue the MAHSO Solicitation, the technical and financial benefits of fair and impartial competition would offset this burden.

As to the public interest, "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations."  *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 576 (Fed. Cl. 2004).  In light of the FAR violations identified herein, the court has determined that the public interest is best served by the issuance of an injunction to set aside the award of the MAHSO Contract to PwC.

For these reasons, the court has determined that E&Y is entitled to injunctive relief.

## IV.   CONCLUSION.

For the reasons discussed herein, Plaintiffs' November 20, 2017 Motion For Judgment On The Administrative Record is granted as to Counts I, II, IV, and, in part, III, and denied as to Count V; the Government's December 8, 2017 Cross-Motion For Judgment On The Administrative Record is denied; and, PwC's December 8, 2017 Cross-Motion For Judgment On The Administrative Record is denied.

In addition, the VA's decision to award Order No. VA101F-17-J-3076 and BPA No. VA101F-17-A-3074 to PwC is set aside and this matter is remanded to the VA.  As set forth in RCFC 52.2(b)(1)(B), the remand will expire in six months, *i.e.*, on August 23, 2018, during which time the VA is enjoined from proceeding with performance under Order No. VA101F-17-J-3076 and BPA No. VA101F-17-A-3074.  As set forth in RCFC 52.2(b)(1)(D), the Government is directed to report the status of this matter "every 90 days or less," until the remand expires.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**